**William N. McLINDEN, William D. McLinden, and Southwick Homes, Ltd., Appellants–Plaintiffs,**

v.

**Ronald COCO, Sr., and Mutual Development Company, Inc., Appellees–Defendants.**

No. 45A05–0105–CV–219.

Court of Appeals of Indiana.

March 20, 2002.

David A. Buls, Casale, Woodward & Buls, LLP, Crown Point, Indiana, Attorney for Appellants.

Julie A. Stephens, Efron and Efron, P.C., Hammond, Indiana, Attorney for Appellees.

## OPINION

BAKER, Judge.

Appellants-plaintiffs William N. McLinden (McLinden), William D. McLinden, and Southwick Homes, Ltd. (collectively "Southwick Homes") appeal the trial court's judgment in favor of appellees-defendants Ronald R. Coco, Sr. (Coco), and Mutual Development Company, Inc. (collectively, "Mutual Development"), on their claims for breach of fiduciary duty and intentional interference with a contractual relationship. More specifically, Southwick Homes asserts that Coco, a shareholder of Southwick Homes, breached a fiduciary duty to the company and other shareholders when he contracted to perform construction work for Whiteco Industries, Inc (Whiteco). Southwick Homes also contends that Mutual Development intentionally induced Whiteco to breach a contract which had enlisted Southwick Homes as developer and construction manager of an upscale subdivision in Lake County.

## FACTS

Southwick Homes is an Indiana corporation in the business of developing and marketing residential subdivisions. Coco and McLinden each own 40% of Southwick Homes' stock. Coco's son, Robert, owns 10% and McLinden's son, William, owns the remaining 10%. In addition to Southwick Homes, Coco and McLinden had a history of business dealings stretching back to the late 1970s, including joint ownership in a third corporation named Southwick Properties.

The present controversy involves the parties' business dealings with Whiteco in the development of an upscale residential subdivision. The parties first dubbed the subdivision "Schulien Woods" and later changed its name to "Morningside Development." In reference to the Schulien Woods development, Whiteco sent the following typed document ("September 1996 Agreement") on Whiteco letterhead to McLinden:

September 24, 1996

William N. McLinden, President

Southwick Properties, Inc.

2025 East 175th Street

Lansing, Illinois 60438

RE: Southwick Homes, Ltd. of Indiana

Schulien Woods Residential Development

Crown Point, Indiana

Our File No. 3115

Dear Bill:

First, I would like to thank you and Ron for meeting with me to discuss the development of Mr. White's upscale community within Schulien Woods, Crown Point, Lake County, Indiana. The purpose of this letter is to outline the agreement reached with respect to Southwick Homes, Ltd. of Indiana serving as project manager for the development of the subdivision. We have discussed that your services will be in a manner as if you were developing the property yourself keeping in mind Mr. White's intentions for this subdivision.

We have discussed that Whiteco Industries will proceed with retaining Jim New Associates and John Vogley to prepare plans and specifications for the infrastructure.

Based upon that information, you will designate a civil engineer to be retained by Whiteco to provide services in connection with the development. You will then prepare cost estimates for construction of improvements and a project

proforma to present to Mr. White for his review and analysis. We will then work together toward providing marketing materials and strategies for the development.

We have discussed that the community will be a gated community with private streets and lake and other community enhancements. You will prepare a bar graph on studies and projections with respect to the project. Whiteco will proceed to locate a mitigation area for off site wetland mitigation.

Within the next 90 to 120 days, we would anticipate that Vogley will provide spec sheets to be sit [sic] adapted by the civil engineer with the engineering to be supplied for the project. As indicated, you will serve as construction manager and project representative with respect to this project. All contracts will be reviewed and entered into by Whiteco.

To compensate you for your services, you will be paid a general construction fee in the amount of 5% of the cost of the improvements. You will be responsible for all supervision of the general construction. On the marketing of the finished lot, you will receive a commission equal to 5% of the purchase price of the lots, plus an additional 5% if a cooperating broker is involved in the sale. As the developer of the subdivision, you will receive a fee of 5% of the development cost.

The project will proceed on the basis of many of our other joint projects with you being fully responsible for the development, subject to Whiteco's approval. Again, we will work together to assure that this is coordinated with you being responsible for the overall project.

In addition, at some point in time we may explore the possibility of a spec home within the community. It would be anticipated that if a spec home is pursued, you will again serve as project manager for a fee equal to 5% of the hard construction cost, with financing provided by Whiteco. Upon sale of the spec home to a third party, Southwick Homes and Whiteco would share equally the profits from the project. The details of the arrangement would be agreed upon prior to construction.

Bill, we look forward to working with you and Ron on this project. If the terms and conditions outlined in this letter are acceptable to you, please note your approval where below indicated and return this letter to me. We think this is an excellent project and a wonderful opportunity for all of us.

Very truly yours,

WHITECO INDUSTRIES, INC.

[signature of John M. Peterman]

John M. Peterman
Executive Vice President
JMP:kml:WP503:092496
AGREED AND ACCEPTED:
SOUTHWICK HOMES, LTD. OF INDIANA
By: [signature of William N. McLinden]
Its: VP

Dated: 24 Sept 96

Appellant's App. at 18–19. McLinden received and signed the document on the same day.

Over a year later Whiteco sent Coco, as President of Mutual Development, a document ("October 1997 Agreement") on Whiteco letterhead in reference to the same subdivision. The document named Mutual Development the developer and general contractor for the subdivision's site work. In exchange for Mutual Development's services, it would receive a 5% development fee and a 5% general contractor's fee. John Peterman signed the document, dated October 1, 1997, and directed that Coco also sign the document to note his

"approval" of the "agreement." Appellant's App. at 20–21. Coco signed the agreement.

On the same date Dean White, the majority shareholder of Whiteco, sent Coco, again as President of Mutual Development, a document ("Personal Residence Agreement") naming Mutual Development the developer and general contractor of White's personal residence to be built in the subdivision. In exchange for it services, Mutual Development would receive a 2½% development fee and a 5% general contractor fee. Appellant's App. at 22–23. Coco signed the document, as directed, to note his approval of the agreement.

A few months after Coco signed both the October 1997 Agreement and Personal Residence Agreement, he informed McLinden that he would not share any of the profits he gained in the construction of the subdivision or White's personal residence. As a result, McLinden, his son, and Southwick Homes filed an amended complaint against Coco, his son, and Mutual Development, specifically alleging tortious interference with contract and fraud. In a motion for summary judgment, which the trial court ultimately denied, Southwick Homes raised the claim of breach of fiduciary duty. Tr. at 326. Subsequently, at the close of Southwick Homes' case, Mutual Development moved for a judgment on the evidence. Among other things, Mutual Development argued that Southwick Homes could not proceed on a claim for breach of fiduciary duty because Southwick Homes failed to plead that claim in its amended complaint. Tr. at 320, 323. The trial court denied Mutual Development's motion for judgment on the evidence. Furthermore, after the close of evidence, Southwick Homes withdrew its allegations of fraud.

The trial court subsequently entered findings of fact and conclusions pursuant to Ind.Trial Rule 52. Specifically, the trial court determined that Southwick Homes failed to prove that the September 1996 document was a valid enforceable contract. Appellant's App. at 16. Instead, the trial court characterized the document as a letter of intent. Appellant's App. at 14. It relied on testimony from White and Peterman in its conclusion that the document was a letter of intent or an agreement to agree and not an enforceable contract. Appellant's App. at 16. Hence, the trial court ruled in favor of Mutual Development on Southwick Homes' claims for tortious interference with contract and breach of fiduciary duty. Appellant's App. at 16–17. Southwick Homes now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

Southwick Homes' claims for breach of fiduciary duty and tortious interference of contract rest, for the most part, on the proper interpretation of the September 1996 Agreement. Because this case turns on the correct interpretation of that document, we recite well-settled principles of contract interpretation and the appropriate standard of appellate review:

It is a court's duty to interpret a contract so as to ascertain the intent of the parties. *First Fed. Sav. Bank of Ind. v. Key Mkts., Inc.*, 559 N.E.2d 600, 603–04 (Ind.1990). The court must accept an interpretation of the contract that harmonizes its provisions as opposed to one which causes the provisions to be conflicting. *Id.* In interpreting a written contract the court will attempt to determine the intent of the parties at the time the contract was made as disclosed by the language used to express their rights and duties. *Id.* The unambiguous language of a contract is conclusive upon the parties to the contract and upon the courts. *Abbey Villas Dev.*

*Corp. v. Site Contractors, Inc.,* 716 N.E.2d 91, 100 (Ind.Ct.App.1999), *trans. denied.* Our standard of review of the interpretation of an unambiguous contract is de novo. *Id.*

However, if the contract is ambiguous or uncertain in its terms and if the meaning of the contract is to be determined by extrinsic evidence, its construction is a matter for the factfinder. *First Fed. Sav. Bank,* 559 N.E.2d at 604. Rules of contract construction and extrinsic evidence may be employed in giving effect to the parties' reasonable expectations. *Id.* If the ambiguity arises because of the language used in the contract and not because of extrinsic facts then its construction is purely a question of law to be determined by the trial court. *Id.* When the court finds a contract to be clear in its terms and the intentions of the parties apparent, the court will require the parties to perform consistently with the bargain they made. *Id.*

## II. Whether the September 1996 Agreement Was an Enforceable Contract

Mutual Development contends that the September 24, 1996 Agreement was not a contract because it lacked an offer, acceptance, and substantial terms of a contract. Appellee's brief at 14. It likens the document to an agreement to agree.

In distinguishing an unenforceable "agreement to agree" from an option contract, our supreme court set forth general guidelines for evaluating whether an agreement is determinate enough to be enforceable. *Wolvos v. Meyer,* 668 N.E.2d 671 (Ind.1996). This case does not involve an option contract. Nonetheless *Wolvos* is helpful in determining when an agreement manifests the parties' intent to be bound and contains terms that are so definite that the agreement is enforceable. *Wolvos*

identified "two interrelated areas: 'intent to be bound and definiteness of terms.'" *Id.* at 675 (quoting 1 Arthur Linton Corbin & Joseph M. Perillo, *Corbin on Contracts* § 2.8, at 131 (rev. ed.1993)). "'[P]romises may be indefinite.... The more important the uncertainty, the stronger the indication is that the parties do not intend to be bound; minor items are likely to be left to the option of one of the parties or to what is customary or reasonable.'" *Id.* (alteration added and omission in original) (quoting *Restatement (Second) of Contracts* § 33 cmt. f (1979)).

### A. Parties' Intent To Be Bound

In examining the parties' intent at the time the agreement was drafted, courts look to whether the parties intended to execute a subsequent written document. *See id.* Mutual Development contends that the September 1996 Agreement shows that the parties intended to execute a subsequent written document with the words: "All contracts will be reviewed and entered into by Whiteco." Appellant's App. at 19. This, however, is not a reasonable reading of the document. The context immediately surrounding that one sentence shows Southwick Homes would serve as "construction manager" and "project representative" and that Southwick Homes would "be paid a general construction fee in the amount of 5% for the cost of the improvements." Appellant's App. at 19. The context shows that the term "future contracts" refers to agreements to be entered into with subcontractors. While an isolated reading of one sentence might produce Mutual Development's desired interpretation, a reading of the whole document fails to show that Southwick Homes and Whiteco intended to execute a subsequent written agreement regarding the marketing and development of the subdivision.

The September 1996 document also contemplates "the possibility" of building a spec home in the subdivision, providing that "the details of the arrangement would be agreed upon prior to construction." Appellant's App. at 19. Again, reading the whole document provides context for properly interpreting "the possibility." This "possibility" is found at the end of the document listing various detailed responsibilities to be undertaken by each party. It casts no doubt on the parties' intent to be bound to the material terms in the September 1996 Agreement. *See Wolvos,* 668 N.E.2d at 675.

Rather, the September 1996 Agreement explicitly reveals that intent: "The purpose of this letter is to outline the agreement reached with respect to Southwick Homes, Ltd. of Indiana serving as project manager for the development of the subdivision." Appellant's App. at 18. In other words, the September 1996 Agreement reduces to writing the agreement the parties had already reached. The document also requests that: "If the terms and conditions outlined in this letter are acceptable to you, please note your approval where below indicated and return this letter to me." Appellant's App. at 19. Peterman signed the September 1996 Agreement and invited a representative of Southwick Homes to sign on a line beneath the words: "AGREED AND ACCEPTED." Appellant's App. at 19. McLinden signed the document and thus manifested his assent to the document's terms. *See Sink & Edwards, Inc. v. Huber, Hunt & Nichols,* 458 N.E.2d 291, 296 (Ind.Ct.App.1984) (noting that party's signing of the contract manifested assent to its terms). In short, there was an offer and acceptance. The next section details the consideration.

### B. Definiteness of Terms

■ We next turn to the question of whether the September 1996 Agreement lacks such essential terms as to render it unenforceable. Only essential terms need be included to render a contract enforceable. *Wolvos,* 668 N.E.2d at 676. " 'All that is required is reasonable certainty in the terms and conditions of the promises made, including by whom and to whom.' " *Id.* (quoting *Johnson v. Sprague,* 614 N.E.2d 585, 588 (Ind.Ct.App.1993)). In the end, the contract must "provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Restatement (Second) of Contracts* § 33(2), at 92 (1979).

■ An examination of the terms of the September 1996 Agreement shows them to be reasonably certain. First, the parties are clearly identified: Whiteco and Southwick Homes. Second, the subject matter of the September 1996 Agreement is clearly set forth: development of property known as Schulien Woods for a residential subdivision. Third, the document sufficiently explains the roles and expectations of each of the parties in the development of the residential subdivision. Southwick Homes was to: 1) serve as project manager for the development of the subdivision; 2) designate a civil engineer to be retained by Whiteco; 3) prepare cost estimates for construction of improvements and a "project proforma"; 4) work with Whiteco in "providing marketing materials and strategies for the development"; 5) prepare a bar graph on studies and projections with respect to the project; 6) serve as construction manager and project representative; and 7) be responsible for all supervision of the general construction. Appellant's App. at 18–19. On the other hand, Whiteco was to: 1) retain Jim New Associates and John Vogley "to prepare plans and specifications for the infrastructure"; 2) work with Southwick Homes in "providing marketing materials and strategies for the development"; 3)

"locate a mitigation area for off site wetland mitigation"; 4) pay Southwick Homes a "general construction fee in the amount of 5% of the cost of the improvements"; 5) pay Southwick Homes "a commission equal to 5% of the purchase price of the lots, plus an additional 5% if a cooperating broker is involved in the sale" on the marketing of a finished lot; and 6) pay a fee of 5% of the development cost. Appellant's App. at 18–19. These terms are certain enough to provide a basis for determining breach and the existence of a remedy. The terms also make clear the existence of the third element of contract: consideration.

However, concluding that the September 1996 Agreement is an enforceable contract does not mean we must completely adopt Southwick Homes' interpretation of the agreement. Southwick Homes maintains that the agreement comprehends the development of the subdivision *and* the construction of White's home. Nowhere does the contract declare that Southwick Homes was responsible for the construction of White's home. Moreover, the trial court found that there was never a deal—oral or written—between Southwick Homes and White to build White's home. We conclude that the September 1996 Agreement is for the marketing and development of the residential subdivision—up to and including the finished lots. The contract, however, does not embrace homes—including White's—to be constructed on the finished lots.

### III. Breach of Fiduciary Duty

Southwick Homes elected to bring suit against Coco and Mutual Development and not against Whiteco. The existence of the contract, thus, is central to its claims for breach of fiduciary duty and tortious interference with contract. We will first address the claim for breach of fiduciary duty.

### A. Whether the Claim Was Sufficiently Pled

Southwick Homes contends that Coco breached his fiduciary duty to Southwick Homes and its shareholders when he independently signed the October 1997 Agreement and the Personal Residence Agreement. Mutual Development argues Southwick Homes may not argue a claim for breach of fiduciary duty because it failed to allege the claim in its complaint. In its written findings and conclusions, the trial court agreed that Southwick Homes had failed to allege the claim and went on to conclude that the evidence would not have supported such a claim even if it had been raised in Southwick Homes' second amended complaint. Appellant's App. at 16.

Indiana's liberal pleading rules and Southwick Homes' amended complaint, however, lead us to a different conclusion:

The principles of notice pleading are utilized in Indiana. Our rules require that "all pleadings shall be so construed as to do substantial justice, lead to disposition on the merits, and avoid litigation of procedural points." Ind.Trial Rule 8(F). Specifically, Indiana Trial Rule 8(A) requires only "(1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for the relief to which the pleader deems entitled...." This rule "is designed to discourage battles over mere form of statement and to sweep away needless controversies that have occurred either to delay trial on the merits or to prevent a party from having a trial because of mistakes in statement." Our notice pleading rules do not require that the complaint state all the elements of a cause of action. A plaintiff essentially need only plead the operative facts involved in the litigation.

*Miller by Miller v. Mem'l Hosp. of South Bend, Inc.*, 679 N.E.2d 1329, 1332 (Ind. 1997) (omission in original) (citations omitted). Applying these principles, this court reviewed a complaint failing to expressly allege a nondelegable duty of care. *Grzan v. Charter Hosp. of Northwest Ind.*, 702 N.E.2d 786, 794 (Ind.Ct.App.1998). In *Grzan*, we recounted the complaint's alleged facts and concluded that it pled operative facts sufficient "to encompass the theory of non-delegable duty" and to put the defendant on notice as to why the plaintiff was suing. *Id.*

■ Here, Southwick Homes alleged the following operative facts: 1) McLinden and Coco each owned 40% of the stock in Southwick Homes; 2) Southwick Homes signed a contract with Whiteco for the development and marketing of a residential subdivision; 3) Over a year later, Coco, on behalf of Mutual Development, re-executed a contract with Whiteco for the development of the same residential subdivision; and 4) Whiteco has been paying Mutual Development, not Southwick Homes, for the development of that residential subdivision. Appellant's App. at 25–27. We think these facts outline a claim for breach of fiduciary duty, as discussed more fully below, and were sufficient to put Mutual Development on notice about why Southwick Homes was suing. *See Grzan*, 702 N.E.2d at 794.

### B. Shareholder Fiduciary Duty and Business Opportunities

Shareholders of close corporations owe fiduciary duties substantially different from the duties owed by their counterparts in publicly traded corporations. *Melrose v. Capitol City Motor Lodge, Inc.*, 705 N.E.2d 985, 990 (Ind.1998). Typically, to be considered a close corporation, a company must not have publicly traded shares and must have relatively few shareholders.

*G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 236 n. 2 (Ind.2001). Our supreme court held that a corporation owned by three shareholders—two of whom were father and son—with no publicly traded shares fell "clearly on the close corporation side of the line." *Id.* There is no indication here that Southwick Homes, a corporation with four shareholders, engages in the public trading of its shares. Coco and his son and McLinden and his son are the only shareholders of the corporation. Just as in *G & N Aircraft*, Southwick Homes falls clearly on the close corporation side of the line.

■ "Indiana courts have characterized closely-held corporations as 'incorporated partnerships' and as such have imposed a fiduciary duty upon shareholding 'partners' to deal fairly not only with the corporation but with fellow shareholders as well." *Melrose*, at 991. As a result, " 'shareholders in a close corporation stand in a fiduciary relationship to each other, and as such, must deal fairly, honestly, and openly with the corporation and with their fellow shareholders.' " *Id.* (quoting *Barth v. Barth*, 659 N.E.2d 559, 561 (Ind.1995)). Moreover, " '[shareholders] may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation.' " *Barth*, 659 N.E.2d at 561 n. 6 (alteration added) (quoting *Donahue v. Rodd Electrotype Co. of New England*, 367 Mass. 578, 328 N.E.2d 505, 515 (1975)).

■ A shareholder's fiduciary duty requires that he "not appropriate to his own use a business opportunity that in equity and fairness belongs to the corporation." *Hartung v. Architects Hartung/Odle/Burke, Inc.*, 157 Ind.App. 546, 555, 301 N.E.2d 240, 244 (1973). Borrowing from Delaware corporation law, this court has further described a business opportunity as follows:

"[I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself. And, if, in such circumstances, the interests of the corporation are betrayed, the corporation may elect to claim all the benefits of the transaction for itself, and the law will impress a trust in favor of the corporation upon the property, interests and profits so acquired."

*Kirtley v. McClelland,* 562 N.E.2d 27, 33 (Ind.Ct.App.1990) (alteration added) (quoting *Guth v. Loft,* 5 A.2d 503, 510–11, 23 Del.Ch. 255 (Del. Sup.1939)).

Both *Hartung* and *Epperly v. E. & P. Brake Bonding, Inc.,* 169 Ind. App. 224, 348 N.E.2d 75 (1976), illustrate the usurpation of a business opportunity. In *Hartung,* a shareholder left the corporation—an architectural firm—and convinced a client of the corporation to turn a project over to him after informing the client of his withdrawal from the corporation. 157 Ind.App. at 556, 301 N.E.2d at 245. We held that the shareholder's action was a breach of fiduciary duty. *Id.,* 301 N.E.2d at 245. Likewise, in *Epperly,* a shareholder left a corporation, taking with him a client representing half of the corporation's business. 169 Ind.App. at 226–27, 348 N.E.2d at 76, 81. We determined that the shareholder's taking of this large customer and setting up a competing business was a breach of fiduciary duty. 169 Ind. App. at 235, 348 N.E.2d at 81.

In the instant case, Southwick Homes had contracted with Whiteco for the development—up to the point of and including the finished lots—and marketing of the residential subdivision. Though Coco had not formally withdrawn as a shareholder of Southwick Homes, in his capacity as president of Mutual Development, he *contracted with Whiteco* for the development of the same residential subdivision. Because we have determined that the September 1996 Agreement was an enforceable agreement, Southwick Homes as a matter of law had a reasonable expectancy in the development of the residential subdivision. Therefore, we conclude that Coco's action was a breach of fiduciary duty. In short, Coco embraced Southwick Homes' business opportunity, bringing his self-interest into conflict with Southwick Homes' interest. *See Kirtley,* 562 N.E.2d at 33.

Southwick Homes, however, is entitled only to those profits Mutual Development acquired in the development of the subdivision up to and including the finished lots. *See Kirtley,* 562 N.E.2d at 33 (noting that " 'the law will impress a trust in favor of the corporation upon the property, interests and profits so acquired' ") (quoting *Guth v. Loft,* 5 A.2d 503, 510–11, 23 Del. Ch. 255 (Del. Sup.1939)). According to the October 1997 Agreement, Mutual Development was to receive "a development fee equal to five percent (5%) of the cost of the site work and a general contractor's fee of five percent (5%) of all costs associated with the site work." Appellants' App. at 32. Southwick Homes is entitled to the profits from these fees-but not to the entire fees themselves. As a result, we must remand this cause to the trial court for a hearing on damages in order that Southwick Homes may recover the profits Mutual Development made on Southwick Homes' business opportunity.

### IV. Tortious Interference with Contract

■■■■ Southwick Homes also maintains that Mutual Development tortiously interfered with the contract. To prove tortious interference with contract, a party must show: the existence of a valid and enforceable contract, defendant's knowledge of that contract, defendant's intentional inducement to breach that contract, the absence of justification, and damages resulting from the breach. *Nat'l City Bank, Ind. v. Shortridge*, 689 N.E.2d 1248, 1252 (Ind.1997). One does not induce another person to breach a contract with a third party, when one "merely enters into an agreement with the other [person] with knowledge that the other [person] cannot perform both it and [the] contract with the third person." *Restatement (Second) of Torts* § 766 cmt. n (1979). Put differently, one does not induce a second party to breach a contract with a third party when one merely enters into an agreement with the second party with knowledge that the second party is unable to perform both contracts. Many jurisdictions have relied on similar formulations,[1] and we believe that comment (n) helps further define the meaning of "intentional inducement."

In applying the elements of tortious interference, Southwick Homes argues that:

> Coco admitted to entering into the October 1, 1997, contract that in essence, conflicted with Southwick's contract for the same scope of work at [the residential subdivision]. Coco knew of the existence of the first contract when he entered into the second contract.

While Coco put forth a defense that the contract between Whiteco and Southwick was not enforceable, he never denied preparing and signing the conflicting contract. This testimony, alone, is an admission of an intentional inducement of a breach. Once Whiteco has entered into two contracts for the same work, it[ ] must decide whether to pay twice for that work or pay on one of the contracts only. In this instance, Whiteco elected to pay Coco rather than Southwick.

Appellant's brief at 23.

■■■ Addressing Southwick Homes' argument, we first turn to the trial court's findings on the tortious interference claim. Its key finding was: "The evidence failed to show that Coco ever approached White or any Whiteco representative to induce them to enter into a contradictory contract." Appellant's App. at 16. Southwick Homes had the burden of proof on the tortious interference claim below and lost. Therefore, the negative judgment standard of review applies. *See Thor Elec., Inc. v. Oberle & Assocs., Inc.*, 741 N.E.2d 373, 381 (Ind.Ct.App.2000). Southwick Homes must show on appeal that the evidence favorable to Mutual Development leads to a conclusion opposite that reached by the trial court. *See Ind. Dept. Envtl. Mgmt. v. RLG, Inc.*, 755 N.E.2d 556, 559 (Ind.2001).

We are concerned now about Coco's conduct—whether he was the "moving force" in the breach of the September 1996 Agreement. *See Corinthian Corp. v. White & Bollard, Inc.*, 74 Wash.2d 50, 442

---

1. *See, e.g., Zelinger v. Uvalde Rock Asphalt Co.*, 316 F.2d 47, 51 (10th Cir.1963) (citing substantially similar formulation of *Restatement (First) of Torts*, § 766 cmt. i (1939)); *Middleton v. Wallichs Music & Entm't Co.*, 24 Ariz. App. 180, 536 P.2d 1072, 1075 (1975) (same); *Araserv, Inc. v. Bay State Harness Horse Racing & Breeding Assoc., Inc.*, 437 F.Supp. 1083, 1094 (D.Mass.1977) ("Notice of the existence of a contract with a third party and the fact that one's actions will render performance of that contract impossible, does not automatically in every case render such actions tortious."); *Corinthian Corp. v. White & Bollard, Inc.*, 74 Wash.2d 50, 442 P.2d 950, 957 (1968) (holding that defendant's action did not have the requisite quality of inducement and its participation was merely an acceptance of an offer, not the "moving force" in the breach).

P.2d 950, 957 (1968). Southwick does not claim, nor does it show, that the evidence favorable to Mutual Development leads to a conclusion opposite that reached by the trial court. Specifically, it does not show that Mutual Development through Coco approached Whiteco and acted as the moving force in forming the October 1997 Agreement. Rather, it is possible that Whiteco approached Coco to discuss the development and this discussion led to the October 1997 Agreement. For these reasons, we are unable to say that Coco intentionally induced breach of the September 1996 Agreement. Thus, Southwick Homes' claim of tortious interference with contract fails.

### CONCLUSION

In conclusion, the September 1996 Agreement between Southwick Homes and Whiteco was valid and enforceable. Coco's subsequent contract with Whiteco for the development of the subdivision—up to and including the finished lots—was a self-interested appropriation of Southwick Homes' business opportunity. Therefore, as a matter of law, the trial court erred in denying Southwick Homes' claim against Coco for breach of fiduciary duty. However, Southwick Homes has failed to show us that the evidence pointed only to a conclusion opposite the one reached by the trial court in its denial of the claim for tortious interference with a contract. Therefore, we reverse in part and remand this cause to the trial court for calculation of damages on the claim for breach of fiduciary duty only.

Affirmed in part, reversed in part, and remanded for hearing on damages.

NAJAM, J., and MATTINGLY–MAY, J., concur.