

FILED
Nov 06 2015, 10:14 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS

Frederick D. Emhardt
Brett E. Nelson
Ryan T. Leagre
Plews Shadley Racher & Braun LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Michael T. Nilan
Teresa J. Kimker
Nilan Johnson Lewis PA
Minneapolis, Minnesota

L. Alan Whaley
Adam Arceneaux
Mark Alson
Ice Miller LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Rick C. Sasso, M.D., and SEE LLC,

*Appellants-Plaintiffs,*

v.

Warsaw Orthopedic, Inc., Medtronic Sofamor Danek, Inc., and Medtronic, Inc.,

*Appellees-Defendants*

November 6, 2015

Court of Appeals Case No. 43A04-1504-PL-175

Appeal from the Kosciusko Circuit Court

The Honorable Curtis D. Palmer, Special Judge

Trial Court Cause No. 43C01-1308-PL-94

**Baker, Judge.**

[1] SEE LLC appeals the trial court's order denying its motion for summary judgment and granting the defendants' cross-motion for summary judgment. It argues that it is entitled to unpaid royalties stemming from a 1998 contract. Finding this contract unenforceable as a matter of law, we affirm the judgment of the trial court.

# Facts[1]

[2] Dr. Rick Sasso is a spinal surgeon and inventor. The president of Indiana Spine Group in Carmel, Indiana, he is the named inventor on several United States patents related to rehabilitation of the spine.

[3] In 1994, Sasso filed his first patent application, with co-inventor Dan Justin, for a spine implant device. Justin later assigned his entire interest to Sasso, making Sasso the sole owner. This device involves screws and rods that provide stability in the upper neck area. Sasso formed a company, SEE LLC (SEE), with his brother and father-in-law to manage his intellectual property. In July 1997, Patent 5,643,259 ("the Patent") issued.

---

[1] We heard oral argument in this case on October 20, 2015, in the Krannert Building of Purdue University in West Lafayette. We thank counsel for their able and informative oral advocacy.

## Background to This Suit

In 1998, Sasso began negotiating a potential business venture with Sofamor Danek Group (SDG), the predecessor to the defendants,[2] in which he would transfer the Patent and provide expertise in exchange for monetary compensation. SDG's first draft of a contract was written as an agreement between SDG and Sasso, but Sasso edited the contract to replace his name with SEE's. Appellants' App. 569-79. The parties signed this 1998 contract ("the Agreement") after these edits had been made. *Id.* at 251-58.

After the edits, one of the representations reads, "See further warrants and represents that it owns solely, as evidenced by a copy of an assignment attached hereto in Schedule A, all right, title, and interest in the Patent and the Intellectual Property Rights . . . ." *Id.* at 571. There is no such document attached to the contract.[3] Indeed, there is no formal assignment document establishing SEE's rights to the Patent anywhere in the record. The right to the Patent was the heart of the deal, as SEE purported in the Agreement to "irrevocably transfer[], assign[], and convey[] to SDG all its entire right, title, and interest in and to" the Patent. *Id.* at 254.

---

[2] The three defendants are corporate affiliates of each other. SDG merged with Medtronic, Inc. in 1999, and Warsaw Orthopedic, Inc., merged with SDG in 2006.

[3] Sasso claims that it is likely that such a document existed but was later misplaced, but he has produced no evidence for such a claim.

[6]     SDG agreed to pay three types of consideration in exchange for the rights to the Patent. First, it agreed to pay, and did in fact pay, $100,000 to SEE. Second, it agreed to grant, and did in fact grant, 1,500 shares of SDG stock to SEE.

[7]     The third form of payment ("4(B)(iii) payment") constitutes the subject of this lawsuit:

> A contingency payment in the amount of five percent (5%) of the worldwide Net Sales of the Medical Device, if covered by the Intellectual Property Rights, and two and one-half percent (2½ %) if the Medical Device is not covered by the Intellectual Property Rights.

*Id.* at 254. "Medical Device" is defined as "any device, article, system, apparatus or product including the Invention." *Id.* at 252. "The Invention" is defined as "any product, method or system relating to spinal or cranial surgery. . . ." *Id.* "Intellectual Property Rights" is defined as the Patent and associated know-how. *Id.*

[8]     Also in the definition of "Medical Device," however, is the following statement: "Such Medical Devices shall be listed in accordance with SDG catalog numbers and descriptions in an addendum to be attached to this Agreement as agreed upon in writing between the parties." *Id.* Just as there was no "Schedule A" attached to the contract to show assignment of the Patent, no such addendum listing the products covered by the agreement was ever negotiated, agreed upon, written down, or attached to the Agreement. The defendants have never made a single 4(B)(iii) payment. Until the

commencement of this lawsuit, SEE never made a demand for 4(B)(iii) payments, nor did it communicate to the defendants that it thought it was owed 4(B)(iii) payments.

## Sasso's Ventures With Medtronic

[9] The controversy between SEE and the defendants is complicated by the extensive business relationship that Sasso, as an individual, has carried on with the defendants. In January 1999, SDG merged with Medtronic. Since that time, Sasso, the individual, has entered into several agreements with the defendants, all for different medical devices related to spinal stabilization. Appellant's App. at 312-13.[4]

[10] Sasso and Medtronic have entered into agreements for the following products in which he transferred his intellectual property in exchange for royalties and, occasionally, up-front cash: a "Posterior Rod System," *id.* at 74; a "facet screw instrumentation and headless facet screw fixation system," *id.* at 108; a "Vantage Plate Device," *id.* at 867; an "Atlantis Venture" product, *id.* at 119-33; a "posterior side-loading spinal rod system," *id.* at 342; a "cervical intervertebral disc prosthesis," *id.* at 362; and an "image guided remote referencing pin used in surgical procedures," *id.* at 409. Altogether, Medtronic has paid Sasso at least $23 million on these deals as of December 22, 2014. *Id.* at 313.

---

[4] Most of these agreements were between Sasso and various affiliates of Medtronic; for the sake of clarity, we will recount these contracts as between Sasso and Medtronic.

Consolidating the definitions in the Agreement, SEE claims it is entitled to at least 2.5% of the sales of "any device, article, system, apparatus or product that includes any product, method or system relating to spinal or cranial surgery." *Id.* at 252. SEE explains, "The broad definitions agreed to by the parties make practically all products Dr. Sasso helped with subject to payment of royalties, including specifically the Vertex posterior cervical screw/rod implant system . . . ." Appellants' Br. 16. In other words, the LLC of which Sasso is one of three members claims a right to be compensated for most, if not all, of the products for which Sasso, the individual, has already been compensated.

The defendants say that they negotiated all of these contracts under the presumption that they would not have to pay double compensation to Sasso and to his company. The defendants maintain that if SEE is correct about its claim, SEE would be entitled to at least $750 million in unpaid royalties. Appellees' Br. 11.[5]

## Other Dealings Between Sasso and Medtronic

In 2005, Medtronic and Sasso attempted to negotiate a "global agreement" that would consolidate all of Sasso's consulting contracts into a single agreement. The parties did not reach such an agreement, but both sides make much ado about representations made during the negotiation. In its original proposal,

---

[5] The defendants do not cite anything in the record to support this figure, but SEE does not appear to dispute it. Presumably, this number is 2.5% of the defendant's revenues made from selling spinal technology.

Medtronic acknowledged that the Agreement was still valid and ongoing. Appellants' App. 606. However, Exhibit D of the draft global agreement listed no products being covered by the 1998 Agreement as of April 1, 2005. *Id.*; *Id.* at 586.

[14] Sasso and Medtronic never entered into this "global agreement," but in 2009 they did enter into an "Amendment" of their existing agreements. *Id.* at 846-49. This executed document, unlike the unexecuted "global agreement," does not list the 1998 Agreement under "existing agreements." *Id.* at 849. When Sasso submitted quarterly reports, as required by this "Amendment," to show what royalties he was owed, his own list of "existing agreements" did not include the 1998 Agreement. *Id.* at 834-49. Shortly after this "Amendment," the members of SEE allowed the LLC to be administratively dissolved by the Indiana Secretary of State.[6]

## The Present Suit

[15] Sometime in 2013, Sasso and Medtronic had a falling out, and Medtronic ceased to make payments on some of the agreements listed above. Sasso and SEE filed suit against the defendants on August 28, 2013. Sasso's individual claims against Medtronic are still being litigated, and are not part of this case. Only SEE's claims under the Agreement are before us.

---

[6] SEE was then revived after the filing of this lawsuit.

The defendants removed the case to federal court, alleging federal jurisdiction under patent laws. The Northern District of Indiana, however, remanded the case to state court after determining that the case turned on Indiana contract law, not federal patent law. On November 5, 2014, SEE filed for summary judgment, arguing that the defendants had contractual obligations to set out a list of products that would have given rise to 4(B)(iii) royalties and to pay those royalties. The defendants responded and filed a cross-motion for summary judgment. The defendants designated affidavits from two attorneys, which Sasso and SEE moved to strike. One affidavit was from Medtronic's Senior Patent Attorney, Thomas Wolfe, who attested that "Medtronic has never used the intellectual property of the '259 patent to develop or commercialize any product." Appellant's App. 310. Sasso and SEE argued that Wolfe did not have the personal knowledge required to make such a sweeping statement.

After holding a hearing, on April 20, 2015, the trial court granted summary judgment against SEE and denied all motions to strike. It found that Sasso never transferred the Patent to SEE and SEE never transferred the Patent to SDG. It ruled that both "the transfer of the 259 patent and the anticipated addendum listing of ensuing medical devices to be covered by the royalty agreement were conditions precedent to the Defendants' obligation to make any royalty payments." *Id.* at 25. The trial court concluded that since both "conditions precedent" failed to obtain, the defendants were relieved of the obligation to make 4(B)(iii) payments. SEE now appeals.

# Discussion and Decision

## I. Standard of Review

This Court reviews grants of summary judgment de novo, giving no deference to the trial court's judgment. *Ind. Dep't of Corr. v. Swanson Servs. Corp.*, 820 N.E.2d 733, 736-37 (Ind. Ct. App. 2005). We apply the same standard as the trial court: summary judgment is appropriate only if the designated evidence shows that there is no genuine issue of material fact and that a party is entitled to judgment as a matter of law. *Id.* at 736; Indiana Trial Rule 56(C). Cross-motions for summary judgment do not alter the standard of review; each motion will be considered separately to determine whether the moving party is entitled to judgment as a matter of law. *Swanson*, 820 N.E.2d at 737. If the trial court's grant of summary judgment can be sustained on any theory or basis in the record, we will affirm. *Id.*

The construction of a written contract is generally a question of law for the court, making summary judgment particularly appropriate in contract disputes. *Stewart v. TT Commer. One, LLC*, 911 N.E.2d 51, 55 (Ind. Ct. App. 2009).

We note initially that while the trial court came to the correct conclusion, its analysis of this case in terms of "conditions precedent" cannot stand. Such conditions are generally disfavored and must be stated explicitly within the contract. *Scott-Reitz Ltd. v. Ren Warsaw Assocs.*, 658 N.E.2d 98, 103 (Ind. Ct. App. 1995). When the required action to be taken is an integral part of the contract, it is not a condition precedent. *Id.* In this case, the successful transfer

of the Patent was the heart of the deal, and was therefore an integral part of the contract. And the proposed list of products to be listed in the missing addendum was to be agreed upon subsequent to the formation of the contract. Therefore, neither the transfer of the Patent nor the listing of parts in an addendum were conditions precedent to the enforceability of the Agreement.

[21] However, as our standard of review makes clear, we will affirm the judgment of the trial court on any basis that the record will sustain. In this case, we find one such theory—the contract was unenforceable as a matter of law.[7]

## II. The Agreement is Unenforceable

[22] To be valid and enforceable, a contract must be reasonably definite and certain. *Conwell v. Gray Loon Outdoor Mktg. Group, Inc.*, 906 N.E.2d 805, 813 (Ind. 2009). It must "provide a basis for determining the existence of a breach and for giving an appropriate remedy." *McLinden v. Coco*, 765 N.E.2d 606, 613 (Ind. Ct. App. 2002).

[23] "When one enters into an agreement with the understanding that neither party is bound until a subsequent formal written document is executed, no enforceable contract exists until the subsequent document is executed." *Wolvos v. Meyer*, 668 N.E.2d 671, 675 (Ind. 1996). On the other hand,

---

[7] SEE also appeals the admission of the Wolfe affidavit. Since our decision is in no part based on that affidavit, and since a ruling in the plaintiffs' favor on this issue would not change the outcome, we decline to address it.

It is quite possible for parties to make an enforceable contract binding them to prepare and execute a subsequent final agreement. In order that such may be the effect, it is necessary that agreement shall have been expressed on all essential terms that are to be incorporated in the document. That document is understood to be a mere memorial of the agreement already reached. If the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; the so-called "contract to make a contract" is not a contract at all.

*Id.* at 674-75 (quoting 1 Arthur Linton Corbin and Joseph M. Perillo, CORBIN ON CONTRACTS § 2.8 (rev. ed. 1993) (footnotes omitted)). We must be mindful that "[e]nforcement of a writing which is incomplete or ambiguous creates the substantial danger that the court will enforce something neither party intended." *Id.* at 675-76.

[24] In this case, SEE is seeking to recover a percentage of the net sales of what the Agreement refers to as "Medical Devices." Appellants' App. at 254. "Medical Device" is defined as follows: "any device, article, system, apparatus or product including the Invention. Such Medical Devices shall be listed in accordance with [Medtronic] catalog numbers and descriptions in an addendum to be attached to this Agreement as agreed upon in writing between the parties." *Id.* at 252.

[25] Clearly, the parties intended the following regarding this provision: SEE would transfer the Patent and associated intellectual property to SDG; the parties would work together to use the Patent to commercialize spinal rehabilitation

technologies; as products were created, they would be compiled on the addendum; and then SEE would be paid either 5% or 2.5% of the net sales of those products, depending on whether the product incorporated the Patent.

[26] The parties never created an addendum listing the products to be covered. This addendum would not have been "a mere memorial of the agreement already reached." *Wolvos*, 668 N.E.2d at 675. It was to be an agreement by the parties in the future over material terms of the contract.

[27] The addendum's absence renders the Agreement unenforceable for two reasons. First, there is no basis for determining whether a breach occurred—since there are no products listed in an addendum, there are no "Medical Devices" as defined in the Agreement. If there are no "Medical Devices," the defendants would not have breached by not paying royalties. The absence of the addendum means that courts would have no way of knowing whether the defendants breached the Agreement.

[28] Second, there is no basis for giving an appropriate remedy—SEE claims an entitlement to either 5% or 2.5% of the net sales of "Medical Devices." But since the definition of "Medical Device" depends on the addendum, and since the addendum does not exist, a court would have no way of determining the damages; 5% or 2.5% *of what*?

[29] Under SEE's interpretation of the "Medical Device" definition, the Agreement obliged the "defendants to provide the initial list and to continually update it as more products were developed." Appellee's Br. 26. But this interpretation is

precluded by the text of the Agreement: "an addendum to be attached to this Agreement *as agreed upon in writing between the parties.*" Appellants' App. at 252 (emphasis added). This language signals an intent by the parties to create the addendum together. It does not create a unilateral obligation in the defendants to provide an addendum.

[30] In sum, the list of products to be counted as "Medical Devices" was an essential term of the contract, one that is needed to determine whether there is a breach and the amount of damages. Its absence renders the Agreement unenforceable at law.

## III. Equity

[31] The defendants raise, as an independent ground for summary judgment, equitable concerns over SEE's conduct. They argue that it would be unjust to allow SEE to wait in silence for fifteen years while one of SEE's members entered into lucrative individual agreements with the defendants. "Medtronic would never have entered into a series of separate royalty agreements with Dr. Sasso and paid Dr. Sasso more than $23 million in royalties . . . [if] the 1998 Agreement also obligated Medtronic to pay SEE LLC *at least $750 million* in royalties on the very same products." Appellees' Br. 41 (emphasis original).

While we find the equity of the situation to strongly favor the defendants, their equitable estoppel argument fails.[8] Nevertheless, we believe that the defendant's equitable concerns are resolved substantially by our conclusion that the contract is unenforceable as a matter of law. SEE was fully aware of the products being produced by Sasso; as a member of the LLC, Sasso's knowledge is imputed to the company. Ind. Code § 23-18-3-2(a). The inequity arising from this situation would have been cured by the inclusion of the addendum— if, as Sasso the individual developed products for Medtronic, SEE had come together with Medtronic to list "Medical Devices" on the addendum to the Agreement, Medtronic would not have been presented with a claim for $750 million in royalties, all at once and fifteen years after the fact. Often, equity does what the law should but cannot; here, the law does what equity cannot but should.

The judgment of the trial court is affirmed.

Robb, J., and Shepard, S.J., concur.

---

[8] Equitable estoppel requires, as a first element, a lack of knowledge and of the means of knowledge as to the facts in question. *Money Store Inv. Corp. v. Summers*, 849 N.E.2d 544, 547 (Ind. 2006). Estoppel has no application where the facts were known equally by both parties. *Ross v. Banta*, 140 Ind. 120, 39 N.E. 732 (1894). We cannot say that the defendants lacked knowledge of a contract entered into by one of their corporate affiliates.