## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 04 2020, 8:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Myra C. Selby
Adam Arceneaux
Derek R. Molter
Ice Miller, LLP
Indianapolis, Indiana

Timothy M. Curran
Paul E. Harold
LaDue, Curran & Kuehn, LLC
South Bend, Indiana

Derrian A. Smith
Maggie L. Smith
Frost Brown Todd, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Frederick D. Emhardt
Emhardt Law, LLC
Carmel, Indiana

Jere L. Humphrey
Wyland, Humphrey & Clevenger, LLP
Plymouth, Indiana

Joseph N. Williams
Riley Williams & Piatt, LLC
Indianapolis, Indiana

John M. Bradshaw
Bradshaw Law, LLC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Warsaw Orthopedic, Inc., Medtronic, Inc., and Medtronic Sofamor Danek, Inc., | December 4, 2020 |
| *Appellants/Cross-Appellees–Defendants,* | Court of Appeals Case No. 19A-PL-378 |
| v. | Appeal from the Marshall Circuit Court |
| Rick C. Sasso, M.D., | The Honorable Curtis D. Palmer, Judge |
| *Appellee/Cross-Appellant–Plaintiff.* | Trial Court Cause No. 50C01-1806-PL-27 |

**Mathias, Judge.**

[1] Following a fifteen-day jury trial in Marshall Circuit Court, the court entered judgment on the jury's verdicts in favor of Rick C. Sasso, M.D. ("Sasso") in the amount of $112,452,269 on Sasso's complaint for breach of two contracts—the Screw Agreement and the Vertex Agreement—against Medtronic, Inc., Medtronic Sofamor Danek, Inc., and Warsaw Orthopedic, Inc. (collectively "Medtronic"). Medtronic appeals and presents several issues for our review, which we restate and reorder as the following six:

    I.    Whether the trial court erred by denying Medtronic's motion to dismiss because Sasso's claims arise under patent law, which is within the exclusive jurisdiction of the federal courts;

    II.    Whether the trial court erred by rejecting Medtronic's argument that it was entitled to judgment as a matter of law on the Screw Agreement;

    III.    Whether the trial court abused its discretion by excluding evidence that some of the claims under one of the patents at issue were declared invalid;

    IV.    Whether the trial court erred by rejecting Medtronic's claim that the Screw Agreement terminated after seven years;

    V.    Whether there is sufficient evidence supporting the jury's award of damages for breach of the Screw Agreement; and

> VI.  Whether there is sufficient evidence supporting the jury's award of damages for breach of the Vertex Agreement.

Sasso cross-appeals and presents one issue: whether the trial court erred by granting summary judgment in favor of Medtronic on Sasso's claim for punitive damages.

We affirm the judgment of the trial court in all respects.[1]

# Statement of Facts

## A. The Parties

Sasso is a native Hoosier who graduated from the Indiana University School of Medicine in 1986. He has since become a renowned spinal surgeon and is a professor and chief of spinal surgery at the Indiana University School of Medicine.

Medtronic[2] sells products for use in spinal surgery. In developing such products, Medtronic often collaborates with spinal surgeons. If a physician invents a surgical product, Medtronic typically enters into an agreement in which the physician assigns patent rights to Medtronic in exchange for royalties for the life of the patent. This case involves two such agreements between Medtronic and

---

[1] We heard oral argument remotely on October 27. 2020. We thank counsel for their well-prepared oral advocacy.

[2] As noted in an earlier appeal involving the same parties: "The three defendants are corporate affiliates of each other. [Sofamor Danek] merged with Medtronic, Inc. in 1999, and Warsaw Orthopedic, Inc., merged with [Sofamor Danek] in 2006." *Sasso v. Warsaw Orthopedic, Inc.*, 45 N.E.3d 835, 836 n.2 (Ind. Ct. App. 2015), *trans. denied*. We refer to all of these corporate entities as "Medtronic."

Sasso: an agreement involving a screw delivery system (the "Screw Agreement") and an agreement involving a posterior cervical fixation system known as Vertex (the "Vertex Agreement").

## B. The Screw Agreement

Early in his practice, Sasso devised a new technique for spinal surgery that minimized incisions by using a tube to guide surgical implements and instruments. The innovative aspect of Sasso's technique was the use of a separate outer tube, known as a cannula, to implant the surgical devices. Without using Sasso's cannula technique, surgeons were required to use guidewires, which presented a host of problems such as breakage, piercing of other body parts, and the serial usage of x-rays.

In the mid 1990s, Sasso spoke with Medtronic's president about his minimally invasive surgery technique. In the spring of 1999, the parties signed a non-disclosure agreement to discuss the innovative screw delivery system. And in the fall of that year, Medtronic held a meeting with Sasso to discuss the innovation. On November 1, 1999, the parties entered into a purchase agreement for a Sasso-invented screw delivery system using headless facet[3] screws, whereby Medtronic would pay a 5% royalty to Sasso on sales if the medical devices sold were covered by a valid claim of an issued patent.

---

[3] Facets are the joints between vertebrae. Tr. Vol. 2, pp. 58–59. *See also Facet Joint Syndrome*, Cedars-Sinai Health Library, https://www.cedars-sinai.org/health-library/diseases-and-conditions/f/facet-joint-syndrome.html [https://perma.cc/LA8L-PR5D] ("The facet joints are the connections between the bones of the spine."). During spinal surgery, facets are often fused together using screws.

[8]     This agreement was soon superseded by the "Screw Agreement." Section 4(B) of the agreement, which is governed by Tennessee law, provided that Medtronic would pay Sasso for the rights to the Invention[4] and the Intellectual Property Rights[5] an amount as follows:

> A contingency payment in the amount of two and one-half percent (2-½%) of the worldwide Net Sales of the Medical Device[6]. . . . The contingency payment is payable to Dr. Sasso until expiration of the last to expire of the patent(s) included in the Intellectual Property Rights, or seven (7) years from the Date of First Sale of the Medical Device, if no patent(s) issue. . . .

Ex. Vol. 14, pp. 19–20. Thus, the royalty rate was lowered from 5% to 2.5%, but it was no longer contingent on the Medical Device being covered by a valid claim of an issued patent.

[9]     Section 7, titled "Term of Agreement," described the duration of the agreement as follows:

---

[4] The agreement defined "Invention" as "any product, method or system relating to a facet screw instrumentation and a headless facet screw fixation system as described in Schedule A, attached hereto." Ex. Vol. 14, p. 17. Schedule A, under the heading "Invention," stated: "Facet Screw Instrumentation and a Headless Facet Screw Fixation System consisting of bone screws and associated instruments for installation thereof." *Id*. at 25.

[5] The agreement defined "Intellectual Property Rights" as "any patent and/or patent application, improvement, modification, enhancement, any and all know-how and technology, and any other intellectual property right with respect to the Invention." *Id.* at 18.

[6] The agreement defined "Medical Device" as "any device, article, system, apparatus or product including the Invention," and was to be listed by catalog numbers in Schedule B. *Id*. The agreement also provided that "Schedule B may be updated from time to time by mutual written agreement of the parties hereto to include the appropriate [Medtronic] catalog numbers and descriptions of any Medical Device(s) which utilize the Invention." *Id*. Schedule B, under the heading "Medical Device Catalog Numbers," listed "Facet Screw Instrumentation, and A Headless Facet Screw Fixation System." *Id*. at 26.

> Unless sooner terminated, this Agreement shall expire upon the last to expire of the patents included in Intellectual Property Rights, **or if no patent application(s) issue into a patent having valid claim coverage of the Medical Device**, then seven (7) years from the Date of First Sale of the Medical Device. [Medtronic] is free to continue manufacturing, marketing and selling Medical Device(s) after expiration of this Agreement without further payment to Dr. Sasso.

*Id*. at 21 (emphasis added).

[10]   Before the parties executed the Screw Agreement, Sasso prepared a patent application covering his screw delivery system. He then assigned the application to Medtronic upon signing the agreement. On November 23, 1999, Medtronic filed a patent application entitled "Screw Delivery System and Method" naming Sasso as the sole inventor and Medtronic as the assignee.[7]

[11]   Based on this application, the United States Patent and Trademark Office ("USPTO") issued Patent No. 6,287,313 ("the '313 Patent") to Medtronic on September 11, 2001. The claims of the '313 Patent, which define the legal scope of the invention subject to the patent, included several numbered claims. For example, claim 26 identified:

> A screw delivery system kit for providing a minimally invasive portal to a surgical site comprising:
>
> an outer cannula;

---

[7] The patent listed one of Medtronic's predecessor's in interest, SDGI Holdings, Inc., as the assignee.

a trocar;

means for drilling an opening in a bone at the surgical site;

means for aiming said means of drilling; and

means for screwing a screw into the opening in the bone.

*Id.* at 146. Claim 34 was derivative of claim 26 and was defined as "[t]he kit of claim 26, further comprising at least one interbody fusion implant." *Id*.

[12] Days after filing the patent application, Medtronic held a meeting with Sasso to work on commercial application of the screw delivery system. Following this meeting, Medtronic sent Sasso a letter that included next steps for incorporating his "technology into the system" and indicated a desire for "future development of this instrumentation system with you." Ex. Vol. 15, p. 28. Medtronic attached to this letter "Recap Notes" that included five "Primary Applications" for the screw delivery system: (1) Precision-Graft; (2) Anterior Cages (2 level); (3) Anterior Cages (1 level); (4) Far lateral placements (including ELIF); and (5) Revision. *Id*. at 29. Thus, the applications of Sasso's system went beyond the scope of mere facet screws to also include interbody implants such as anterior cages.

[13] Sasso consistently believed that that interbody implants, such as cages, were included in his system and were therefore royalty bearing. Medtronic's president assured Sasso, in January 2002, that "at the end of the day, your royalty stream is limited only by our collective sales and marketing efforts. With our recent FDA

panel recommendation for InFUSE approval, the projections below may be magnified." *Id*. at 91–92. InFUSE is a bone-growth compound used inside cages implanted inside vertebral bodies. In other words, Medtronic believed that Sasso's royalties included sales based on InFUSE, which did not incorporate facet screws.

[14] In 2003, Medtronic invited Sasso to join a team of experts working on navigated surgery. Medtronic's navigated-surgery team developed leading systems, including two that were first sold to the Indianapolis hospital where Sasso works. The team also worked on a guidewire-less spinal surgery procedure. When Medtronic introduced this system, its presentation included Sasso's screw delivery system. And in 2010, Medtronic's navigation catalog listed instruments used in Sasso's system under items used for navigated spinal surgery.

[15] The Screw Agreement provided that the parties would update Schedule B—which listed the royalty-bearing Medical Devices—from time to time to include the appropriate Medtronic catalog numbers and descriptions of any devices that utilized Sasso's invention. Although the parties never updated Schedule B, Medtronic paid royalties to Sasso for unlisted devices, including payment for "cortical bone screws" from 2003 through 2015. Tr. Vol. 11, pp. 31–32.

[16] In 2008, Sasso complained to Medtronic that he was not being paid royalties on all Medtronic products that used his screw delivery system. In an attempt to rectify the situation, he met with Medtronic's chief medical officer. But in 2010, when Doug King became Medtronic's division president, the parties' relationship

soured. And two years later, Medtronic's counsel told Sasso to make no further contact with Medtronic employees.

## C. The Vertex Agreement

[17] The parties also entered into an agreement involving a system known as Vertex. In the 1990s, spinal surgeons often had difficulty properly anchoring and aligning screws and plates in the cervical spine during surgery. As a result, treatment of spinal deformities regularly required immobilization and long recovery times. In 1998, Sasso worked with Medtronic to develop a posterior spinal rod system. This project subsequently merged with a preexisting project known as the Vertex project. The resulting Vertex system solved the problem of anchoring and alignment by using polyaxial screws and offset pieces to connect stabilizing rods in the spine. Screws no longer had to be perfectly aligned, thereby giving more flexibility to the surgeons installing them.

[18] In 1999, the parties entered into the Vertex Agreement. Section 4(B) of the agreement provided:

[Medtronic] shall pay to DR. SASSO for the ownership rights to the Invention[8] and all Intellectual Property Rights[9] relating thereto an amount as follows:

A royalty payment in the amount of two percent (2%) of the Net Sales of the Medical Device[10] for a period of eight (8) years from the date of the first commercial sale of the Medical Device(s). However, if the Medical Device is covered by a valid claim of an issued U.S. patent arising out of the Intellectual Property Rights, then the royalty payment specified above will be payable for the life of the patent. . . .

---

[8] The agreement defined "Invention" as

> a posterior cervical rod system utilizing multi-axial screws as described in the Intellectual Property Rights and including any know-how, and/or technical information relating [to] the posterior cervical rod system in the possession of DR. SASSO, or hereinafter developed by DR. SASSO in the course of his providing services to [Medtronic] pursuant to Section 6 of this Agreement.

Ex. Vol. 14, pp. 4–5.

[9] The agreement defined "Intellectual Property Rights" as

> U.S. patent application entitled "Posterior Cervical Fixation System Utilizing Multi-axial Screws", (USSN 09/663,638) filed on September 15, 2000, naming DR. SASSO as a co-inventor, and including any and all U.S. and International patents issuing therefrom or claiming priority thereto, and any and all continuations, continuation-in-part, divisionals, reissues or reexaminations based thereon or claiming priority thereto, and any and all know-how, technology and any other intellectual property right with respect to the Invention. A listing of all Intellectual Property Rights is contained in Exhibit A which will be updated by [Medtronic] from time to time (at least yearly) as additional Intellectual Property Rights are added to the Agreement.

Id. at 5.

[10] The agreement defined "Medical Device" as

> the posterior cervical rod system (to be commercially sold under the trademark "Vertex Reconstruction System") incorporating the Invention and Intellectual Property Rights as developed, manufactured and sold by [Medtronic] pursuant to this Agreement. Medical Devices are listed by catalog number in Exhibit B, attached hereto. Exhibit B may be amended periodically by [Medtronic] with written notification to DR. SASSO to update the various components of the Medical Device included in the Invention.

Id.

Ex. Vol. 14, p. 7.

[19]     Section 6 of the agreement required Sasso to provide his technical expertise and knowledge in developing and improving Vertex:

> In order to fully effect the assignment provided for under this Agreement, DR. SASSO shall provide his technical skills and services to [Medtronic] in connection with the ongoing development and clinical evaluations of the Medical Devices, including any advancements, improvements and/or modifications of the Invention and Medical Devices. To the extent DR. SASSO's other business and medical practice commitments permit, DR. SASSO shall make himself available to provide such services from time to time as reasonably requested by [Medtronic]. [Medtronic] shall reimburse DR. SASSO for reasonable expenses of travel, lodging, daily meals and other necessary and reasonable expenses incurred by him in the performance of the services described in this Section 6, provided that such expenses are supported by original receipts and other supporting documentation and that DR. SASSO obtains prior authorization of [Medtronic] prior to incurring any such expenses.

*Id*. at 8. The Vertex Agreement, like the Screw Agreement, is governed by Tennessee law.

[20]     On November 26, 2002, Patent No. 6,485,491 ("the '491 Patent") issued—covering the Vertex system—naming Sasso among its inventors and Medtronic as the assignee. Soon after Vertex was released as a product, there were several concerns that needed to be addressed. To rectify the concerns and improve the Vertex system, Sasso contributed ideas and know-how to two other patents ("the

'621 Patent"[11] and "the '714 Patent"). Because the '621 and '714 Patents were based on Sasso's contributions to the Vertex system, Sasso interpreted the Vertex Agreement to mean that he would also receive life-of-patent royalties from products covered by these patents.

[21] Medtronic used a code to account for royalties due on Vertex products. Specifically, in 2001, it created code 366 to identify Vertex parts. And when the agreement was signed, Exhibit B to the Vertex Agreement listed seventy-seven parts. However, Medtronic later added nearly 2,000 additional Vertex royalty-bearing parts without adding them to Exhibit B. Medtronic's royalty cards, which summarized quarterly Vertex sales, contained a notation of "Expires 12/31/08," which was consistent with the agreement's guaranteed term of eight years. Ex. Vol. 30, pp. 35–47. After the initial eight years, however, the cards read "Patented 11/26/02" or "8 years after commercial launch or life of patent," or "Patented 11/26/02, Expires 11/26/19." *Id*. at 48–74. Then, in 2013, Medtronic stopped paying Sasso royalties on the Vertex products, claiming that that the previous seventeen quarterly royalty payments were mistaken.

## Procedural History

### A. The Litigation

[22] On August 29, 2013, Sasso and SEE, LLC—a corporation that Sasso formed with family members to manage Sasso's intellectual property—filed suit against

---

[11] This patent incorporated by reference the entire '491 Patent.

Medtronic, alleging a breach of the Vertex Agreement and another agreement not involved here. Medtronic removed the case to federal court, alleging exclusive federal jurisdiction under patent laws. The United States District Court for the Northern District of Indiana, however, remanded the case to state court after determining that the case turned on Indiana contract law, not federal patent law.[12] Sasso then amended his complaint to allege a breach of the Screw Agreement.

[23] On October 3, 2016, Medtronic filed two motions: (1) a motion to dismiss, arguing that all of Sasso's breach-of-contract claims depended upon issues of patent law that are exclusively in the jurisdiction of the federal courts; and (2) a motion for summary judgment. The trial court denied both motions. On March 27, 2017, Sasso filed an amended complaint, again alleging that Medtronic had breached both the Screw Agreement and the Vertex Agreement by failing to pay him what he believed he was due under the agreements. Sasso also added a claim for punitive damages for bad-faith breach of the agreements. Medtronic moved for summary judgment on this claim, which the trial court granted.

*B. The Patent Reexamination*

[24] While the litigation ensued, on May 1, 2018, Medtronic filed with the USPTO a request for ex parte reexamination of several claims of Sasso's '313 Patent. Medtronic argued that Sasso's positions in the instant lawsuit interpreted the

---

[12] After remand, the Indiana trial court granted summary judgment against SEE, a decision that a panel of this court affirmed on appeal, *Sasso*, 45 N.E.3d at 836.

claims of the '313 Patent so broadly that it rendered the claims invalid. That is, Medtronic asserted that the breadth of the claims—as alleged by Sasso—meant that they were not novel as required by federal patent law and were instead obvious, thereby rendering them ineligible for patent protection. On June 29, the USPTO issued an "Office Action" rejecting claims 26, 30, 31, and 34 of the '313 Patent. But this action was not final. The USPTO issued a final office action rejecting claims 26 and 34 on October 29, and it issued a Reexamination Certificate cancelling claims 26 through 34 on January 4, 2019—after the jury trial in this case.

[25] Meanwhile, on July 2, 2018, Sasso filed a motion for partial summary judgment on the term of the Screw Agreement, arguing that the term was not altered by the validity of any patent. In a related motion, on August 14, Sasso moved to exclude any evidence regarding the validity of the patents at issue in the lawsuit. The trial court granted both of Sasso's motions on September 13—after the USPTO had issued its initial office action, but before the final office action.

C. *The Federal Declaratory Judgment Action*

[26] Also, during this time, on June 8, 2018, Medtronic filed a complaint for declaratory judgment in the United States District Court for the Northern District of Indiana, seeking a declaration that it owed Sasso nothing under the Screw Agreement. The District Court denied this motion by order on January 31, 2019. See *Warsaw Orthopedic, Inc. v. Sasso*, No. 3:18-CV-437 JD, 2019 WL 428574 at *4 (N.D. Ind. Jan. 31, 2019). In that order, the District Court assumed that it had

federal jurisdiction, but declined to exercise it under the doctrine of abstention. *Id.*

[27] Medtronic appealed the order to the United States Court of Appeals for the Federal Circuit, which recently issued its opinion. *Warsaw Orthopedic v. Sasso*, 977 F.3d 1224 (Fed. Cir. 2020). In the Federal Circuit, Sasso argued (as he does here) that there was no federal jurisdiction. Importantly, for the case before us, although the court rejected that claim and found it had jurisdiction over the appeal, the Federal Circuit affirmed the District Court's decision to abstain. *Id.* at 1231–32.

### D. The Trial

[28] A fifteen-day jury trial began on November 1, 2018. Sasso called Michael Pellegrino to provide expert testimony on damages under the Screw Agreement.[13] Pellegrino testified that Sasso's damages under the Screw Agreement, at the 2.5% contract rate, totaled $79,794,721. Medtronic's witness testified that Sasso's damages were considerably smaller. For the Vertex Agreement, Sasso presented testimony from a CPA who calculated damages in the amount of $32,657,548.

[29] The jury began deliberating on November 28, 2019. During its deliberations, the jury asked if there was any dispute regarding whether Sasso transferred the '313 Patent as part of the Screw Agreement. The parties agreed that the patent had been transferred, and the trial court so informed the jury. Ultimately, the jury

---

[13] Medtronic moved to exclude Pellegrino's expert opinions, which the trial court denied.

rendered a verdict in Sasso's favor, awarding him damages of $112,452,269: $32,657,548 on the Vertex Agreement and $79,794,721 on the Screw Agreement.[14] The court then entered judgment accordingly. Medtronic filed a motion to correct error on December 28, 2018, which the trial court denied a few weeks later.

Medtronic now appeals, and Sasso cross-appeals.

## I.  Subject Matter Jurisdiction

Although listed as Medtronic's second argument, the alleged lack of subject matter jurisdiction is a threshold issue that we address first.[15] Medtronic claims that the trial court lacked subject matter jurisdiction because Sasso's claims "arise under" patent law, which is within the exclusive jurisdiction of the federal courts. 28 U.S.C. § 1338 (2011). The controlling federal statute provides in relevant part:

> (a) The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks. **No State court shall have jurisdiction over any claim for relief arising under**

---

[14] The jury awarded no damages on Sasso's alternative theory of unjust enrichment and found against Medtronic on its counterclaim of mistake.

[15] Sasso claims that Medtronic's claim on this issue is frivolous because the Federal District Court for the Northern District of Indiana remanded this case back to state court after Medtronic removed it to federal court. "An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise." 28 U.S.C § 1447(d). Sasso claims that Medtronic seeks "review" of an unreviewable order. But Medtronic is not seeking "review" in the appellate sense; it merely asks us to disagree with the federal court. *See Harr v. Hayes*, 106 N.E.3d 515, 528 (Ind. Ct. App. 2018) (holding that appellant's argument was not frivolous even though it conflicted with federal district court's remand order because appellant sought review of Indiana trial court's order, not the district court's order), *corrected on reh'g*, 108 N.E.3d 405. Moreover, because the remand order was unappealable, it is not res judicata. *Warsaw Orthopedic*, 2019 WL 428574 at *1 n.2.

> **any Act of Congress relating to patents**, plant variety protection, or copyrights. . . .

*Id.* (emphasis added).

[32] As explained by the Supreme Court of the United States:

> One of the fundamental purposes behind the Patent and Copyright Clauses of the Constitution was to promote national uniformity in the realm of intellectual property. Since the Patent Act of 1800, Congress has lodged exclusive jurisdiction of actions "arising under" the patent laws in the federal courts, thus allowing for the development of a uniform body of law in resolving the constant tension between private right and public access.

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 162 (1989).

[33] At first blush, 28 U.S.C. § 1338 appears to categorically deprive state of courts of jurisdiction over any patent-related claim. But because "[a] suit arises under the law that creates the cause of action," *Am. Well Works Co., v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916), state courts will maintain jurisdiction over a patent-related claim that "arises under" state law unless the case falls within a "special and small category," *Gunn v. Minton*, 568 U.S. 251, 258 (2013). More specifically, four conditions are required to deprive state courts of jurisdiction over a patent-related state-law claim: the claim must include a federal issue that is (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal–state balance approved by Congress. *Id.* (citing *Grable & Sons Metal Prods, Inc. v. Darue Eng'g & Mfg.,* 545 U.S. 308, 313–14 (2005)). Medtronic claims that all four requirements were met

here, and thus the federal courts have exclusive jurisdiction over Sasso's claims. We disagree. But before explaining why, we briefly review the federal proceedings related to this case.

[34] Recall that, prior to trial, Medtronic filed a declaratory judgment action in the United States District Court for the Northern District of Indiana asking the court to declare that Medtronic owed Sasso nothing under the Screw Agreement. The District Court addressed the issue of jurisdiction but decided to abstain from exercising any jurisdiction it had, given the pending action in the state court. Thus, Medtronic's effort to sidestep the state trial on the Screw Agreement failed. Medtronic then appealed this decision to the United States Court of Appeals for the Federal Circuit, which was pending at the time the parties filed their briefs in the present case.

[35] Then, days before we held oral argument, the Federal Circuit issued its decision. *Warsaw Orthopedic v. Sasso*, 977 F.3d 1224 (Fed. Cir. 2020). In that appeal, Sasso argued that there was not exclusive federal jurisdiction because the declaratory judgment action involved a state contract claim, or alternatively, that if there was federal jurisdiction, the District Court properly abstained. Although the Federal Circuit affirmed the District Court's decision to abstain from exercising jurisdiction, the court first rejected Sasso's jurisdictional argument:

> Applying the standards of precedent [i.e., the four *Gunn* factors], the issues of validity and claim scope are well-pleaded in this declaratory complaint, are actually disputed, are substantial to the federal system as a whole, and the federal-state judicial balance would not be disrupted by the district court's exercise of

declaratory jurisdiction. **Thus, this declaratory action is within the district court's jurisdictional authority, and we have jurisdiction to receive this appeal** and to determine whether the district court abused its discretion in abstaining from exercise of declaratory jurisdiction.

*Id.* at 1229. (emphasis added)

[36] The parties disagree on the effect the above jurisdictional analysis has on this case. Sasso claims that the Federal Circuit's decision stands for the proposition that the District Court properly abstained from exercising its jurisdiction. Medtronic, however, argues that the decision did the opposite, i.e., that the Federal Circuit explicitly held that there was exclusive federal jurisdiction over the declaratory judgment action. And because Medtronic maintains that its declaratory judgment action is a "mirror image" of Sasso's complaint regarding the Screw Agreement, Medtronic asserts that the Federal Circuit also has exclusive jurisdiction over Sasso's claims relating to the Screw Agreement. We disagree with Medtronic's interpretation of the opinion.

### A. The Federal Circuit's Opinion is Not Res Judicata

[37] We first conclude that the Federal Circuit's opinion is not res judicata. The doctrine of res judicata, which acts to prevent repetitious litigation of disputes that are essentially the same, is divided into two branches: claim preclusion and issue preclusion. *Angelopoulos v. Angelopoulos*, 2 N.E.3d 688, 696 (Ind. Ct. App. 2013), *trans. denied.* Common among both branches is a judgment in a *former* lawsuit that bars relitigation of the same claim or issue in a *subsequent* lawsuit. *See id.* This requirement is lacking here.

The federal declaratory judgment action is not a former lawsuit; it was filed years after Sasso's complaint for damages. And the District Court's order denying Medtronic's request for declaratory judgment was issued on January 31, 2019, **after** the trial court entered judgment on the jury's verdict in the present case. Further, the Federal Circuit's opinion affirming the District Court did not issue until well over a year after the verdict. In short, neither decision by the federal courts—on Medtronic's declaratory judgment action—acts as res judicata to prevent us from examining the issue of subject matter jurisdiction ourselves—on Sasso's complaint for damages.

### B. Sasso's Complaint Does Not Give Rise to Exclusive Federal Jurisdiction

This leaves us to decide whether Sasso's complaint arises under federal patent law, in which case exclusive jurisdiction lies with the federal courts. As noted above, the U.S. Supreme Court has identified a "special and small category" of cases in which exclusive federal jurisdiction lies even if a claim finds its origin in state law. *Gunn*, 568 U.S. at 258. To fall within this category, the state-law claim must include a federal issue that is (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress. *Id.* Federal jurisdiction is proper only "[w]here all four of these requirements are met." *Id.*

Here, even assuming that that three of the *Gunn* requirements are met, this case does not fit within the "special and small" category of cases because, under *Gunn* and its progeny, the federal patent issue is not "substantial." When determining whether a federal issue is "substantial" in this context, the inquiry is not whether

the issue is "significant to the particular parties in the immediate suit." *Id.* at 260.

Instead, the proper focus is on "the importance of the issue to the federal system

as a whole." *Id.* To assist in this inquiry, the federal courts have identified three

factors:

> First, a pure question of law is more likely to be a substantial federal question. *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 700–01 (2006). Second, a question that will control many other cases is more likely to be a substantial federal question. *Id.* Third, a question that the government has a strong interest in litigating in a federal forum is more likely to be a substantial federal question. *Grable [& Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 315–16 (2005)].

*MDS (Canada) Inc. v. Rad Source Techs., Inc.*, 720 F.3d 833, 842 (11th Cir. 2013).

[41]     Applying the three factors here reveals that the federal patent-law issue is not

"substantial." First, this is not a case that implicates a pure question of federal-

patent law: the actual issue to be determined by the jury—whether Medtronic

breached its agreements with Sasso—was heavily fact sensitive. Second, this is

not a case where the judgment will control many other cases; it controls only

Medtronic and Sasso. Finally, this is not a case in which the federal government

has a strong interest in litigating the issue in federal court; this is fundamentally a

contract dispute of the sort typically heard in state courts. And the fact that

Tennessee law governs the Screw Agreement does not alter this conclusion:

Indiana courts often have to apply the law of our sister states under contractual

choice-of-laws provisions.

[42] We find support for this conclusion in the "substantiality" analysis of both *Gunn* and *Inspired Development Group, LLC v. Inspired Products Group, LLC*, 938 F.3d 1355 (Fed. Cir. 2019).

[43] In *Gunn*, the U.S. Supreme Court made three observations in determining that a federal patent-infringement issue was not "substantial in the relevant sense." 568 U.S. at 260. First, regardless of the outcome in state court, the patent at issue would remain invalid. *Id.* at 261. Second, allowing the state courts to resolve the case would not undermine the development of a uniform body of patent law. *Id.* at 261–62. And third, even if the state court's "case-within-a-case" adjudication might have some preclusive effect under some circumstances, the result would be limited to the specific parties that had been before the state court. *Id.* at 262–63.

[44] Just last year, in *Inspired Development Group*, the Federal Circuit applied the *Gunn* substantiality analysis and reached a similar conclusion. *Inspired Dev. Grp.*, 938 F.3d at 1363–68. There, the court held that a state-law action for breach of contract and unjust enrichment did not implicate a substantial federal issue for several reasons, including: the patent-infringement issue was not dispositive of whether the plaintiff was entitled to relief; the resolution of the issue would not control other cases because state courts cannot invalidate patents; any state-court judgment would not have preclusive effect outside the parties; the case did not present a novel question of patent law of concern to the federal court system; and, due to the "fact-bound" nature of the patent-law issues, the government had "no direct interest" in the outcome of the dispute. *Id.*

[45] The same circumstances that led the courts in *Gunn* and *Inspired Development Group* to find no "substantial" federal issue are also present here. Regardless of the outcome of Sasso's breach-of-contract claims, the patents Sasso assigned to Medtronic remain valid (or invalid), and the '313 Patent expired in 2019. Further, the jury's verdict in this case does not undermine the development of a uniform body of patent law, as it governs only the contractual agreements between Medtronic and Sasso. Thus, any preclusive effect is limited to these parties. Finally, this case does not present a "novel" question of patent law that would interest the federal government. In short, Medtronic ignores the limited nature of Sasso's claim, and, just as in *Gunn* and *Inspired Development Group*, the federal patent-law issue here is not substantial for jurisdictional purposes. *See also Forrester Envt'l Servs., Inc. v. Wheelabrator Techs., Inc.*, 715 F.3d 1329, 1335–36 (Fed. Cir. 2013).

[46] And while we acknowledge Medtronic's argument to the contrary, we find its heavy reliance on *Jang v. Boston Scientific Corp.*, 767 F.3d 1334 (Fed. Cir. 2014) (commonly referred to as "*Jang III*") misplaced. There, the Federal Circuit held that "the disputed federal patent law issues presented by Jang's well-pleaded complaint are substantial and neither entirely backward-looking nor hypothetical." *Id.* at 1337. In reaching this conclusion, the Federal Circuit made three observations. First, Jang's right to relief on his contract claim depended "on an issue of federal patent law—whether the stents sold by [petitioners] would have infringed [Jang's patents].'" *Id.* at 1336 (quoting *Jang v. Bos. Sci. Corp.*, 532 F.3d 1330 (Fed. Cir. 2008)). Second, the court noted that "[c]ontract claims

based on underlying ongoing royalty obligations . . . raise the real world potential for subsequently arising infringement suits affecting other parties." *Id.* at 1337. Finally, the court recognized that, because Jang filed suit in federal court based on diversity of citizenship, the case implicated a "significant" potential for inconsistent federal court judgments that could adversely affect other parties facing similar infringement claims. *Id.* at 1338; *see Inspired Dev. Grp.,* 938 F.3d at 1365 (recognizing that the "tension between federal courts of appeal controlled" the *Jang III* court's substantiality analysis).

[47] None of these same circumstances are present here. The jury did not need to determine whether Medtronic's products would have infringed on Sasso's patents. To the contrary, Sasso had assigned the patents at issue to Medtronic, and thus the jury had to determine only whether the products were covered under the royalty provisions of the agreements. Further, this case does not involve "ongoing" royalty obligations, and there is no evidence of potential "suits affecting other parties." Finally, this case has proceeded in state court and thus does not implicate any "significant" potential for inconsistent federal court judgments.

[48] But what of the Federal Circuit's decision in the declaratory action filed by Medtronic? The Federal Circuit summarily concluded that Medtronic's "declaratory action is within the district court's jurisdictional authority, and we have jurisdiction to receive this appeal." *Warsaw Orthopedic*, 977 F.3d at 1229. Although, for reasons provided above, that decision is not res judicata,

Medtronic argues that it should at least be persuasive authority regarding the *Gunn* requirements. We disagree for three reasons.

First, a careful examination of the Federal Circuit's opinion reveals that the court's analysis of the *Gunn* requirements was, at best, cursory. Second, and more importantly, that analysis was based on the language of Medtronic's complaint for declaratory judgment, **not** on Sasso's state-court complaint. And third, the Federal Circuit ultimately concluded that the District Court properly exercised its discretion to abstain from exercising jurisdiction, *id*. at 1232, which further weighs against a finding of exclusive federal jurisdiction here.

In sum, even assuming that Sasso's complaint necessarily raised an issue of federal patent law that was actually disputed and capable of resolution in federal court without disrupting the federal–state balance approved by Congress, Medtronic has failed to show that the patent-law issue, under *Gunn* and its progeny, is "substantial in the relevant sense." 568 U.S. at 260. Thus, this case does not fit within the small and special group of cases that lie within the exclusive jurisdiction of the federal courts even though they originate in state law claims. Because the trial court and this court have subject matter jurisdiction over Sasso's contractual claims, we address the remainder of Medtronic's appellate arguments as well as Sasso's argument on cross-appeal.

## II.  Judgment as a Matter of Law

Medtronic asserts that Sasso's claims regarding the Screw Agreement should never have proceeded to trial because, on this agreement, Medtronic was entitled

to judgment as a matter of law. Specifically, Medtronic claims that the plain language of the Screw Agreement establishes that Sasso is not entitled to additional monies outside what Medtronic has already paid; therefore, it argues, the trial court should have granted its pretrial motion for summary judgment and its trial motions for a directed verdict.

## A. Standard of Review

We review a trial court's order granting or denying summary judgment de novo. *Rapkin Grp., Inc. v. Cardinal Ventures, Inc.*, 29 N.E.3d 752, 756–57 (Ind. Ct. App. 2015) (citing *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014)), *trans. denied*. We apply the same standard as the trial court: "[d]rawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* Similarly, a motion for a directed verdict, also known as judgment on the evidence, must be granted only if there is no substantial evidence or reasonable inference to be drawn therefrom to support an essential element of the non-movant's claim. *Walgreen Co. v. Hinchy*, 21 N.E.3d 99, 106 (Ind. Ct. App. 2014), *aff'd on reh'g*, 25 N.E.3d 748 (Ind. Ct. App. 2015), *trans. denied*. We consider only the evidence most favorable to the nonmovant along with all reasonable inferences that may be drawn therefrom, and a motion for judgment on the evidence should be granted only when the evidence is not conflicting and susceptible to only one inference, supporting judgment for the movant. *Id.*

*B. Medtronic Has Failed to Show that it was Entitled to Judgment as a Matter of Law on the Screw Agreement.*

Medtronic contends that, under the terms of the Screw Agreement, Sasso was entitled to royalties only on products listed in Schedule B of that agreement. The Screw Agreement provided that Medtronic would pay Sasso for the rights to his "Invention" and "Intellectual Property" in an amount of 2.5% of the worldwide sales of the "Medical Device." Ex. Vol. 14, pp. 19–20. The term "Medical Device" was defined as "any device, article, system, apparatus or product including the Invention," and was to be listed by catalog numbers on Schedule B. *Id*. at 18. Schedule B, under the heading "Medical Device Catalog Numbers," listed "Facet Screw Instrumentation, and A Headless Facet Screw Fixation System." *Id*. at 26. But no catalog numbers were ever listed on Schedule B, and it was never updated by agreement of the parties. Nevertheless, Medtronic paid millions of dollars in royalties to Sasso under the terms of the Screw Agreement.

Medtronic insists that it never sold a headless facet screw fixation system and that Sasso was entitled to royalties only on facet screws—the only products listed in Schedule B that it actually sold. In support of this argument, Medtronic cites to our earlier decision involving these parties in *Sasso v. Warsaw Orthopedic, Inc.*, 45 N.E.3d 835 (Ind. Ct. App. 2015) ("SEE"), *trans. denied*.

The agreement at issue in *SEE* provided that Sasso would transfer to Medtronic a patent related to spinal implants in exchange for monetary compensation. 45 N.E.3d at 839. One of the provisions of the parties' agreement stated that SEE, LLC, a company formed by Sasso, "warrants and represents that it owns solely,

as evidenced by a copy of an assignment attached hereto in Schedule A, all right, title, and interest in the Patent and the Intellectual Property Rights." *Id*. at 837. However, there was no Schedule A attached to the agreement. *Id.* Part of the compensation to Sasso included a "contingency payment in the amount of five percent (5%) of the worldwide Net Sales of the Medical Device, if covered by the Intellectual Property Rights, and two and one-half percent (2½%) if the Medical Device is not covered by the Intellectual Property Rights." *Id*. The contractual definition of "Medical Device" was to be listed in accordance with the defendants' catalog numbers in an addendum to be attached to the agreement. *Id.* at 837–38. But again, no such addendum was ever created or attached to the agreement, and thus Medtronic never paid Sasso under this provision. *Id.*

[56] Our court affirmed the grant of summary judgment in favor of Medtronic. We concluded that the contract was unenforceable, as a matter of law, because it was not definite and certain. *Id*. at 841. More specifically, by failing to create the addenda, the parties rendered the agreement unenforceable for two reasons: (1) because there was no list of Medical Devices as defined in the agreement, there was no basis to determine whether a breach occurred; and (2) because there was no way of determining whether SEE was entitled to 5% or 2.5% of anything, there was no basis for any remedy. *Id*.

[57] Here, Medtronic argues that *SEE* is controlling in the sense that decision holds that the products listed in the schedule control Medtronic's royalty obligations. Medtronic contends that it paid Sasso royalties on all facet screws it sold and that, under the terms of the Screw Agreement, both parties had an obligation to

update Schedule B as needed, but neither did. Therefore, Medtronic maintains that, just as in *SEE*, it paid Sasso all that he was due under the agreement and was entitled to judgment as a matter of law on this issue. We disagree.

[58] Under Tennessee law, which governed the Screw Agreement, modification of a contract need not be express but may be implied from a course of conduct. *Lancaster v. Ferrell Paving, Inc.*, 397 S.W.3d 606, 611–12 (Tenn. Ct. App. 2011). This is true even where the contract expressly specifies that the parties may only modify an agreement in writing. *Id.* at 612. Here, it is apparent that Schedule B— included with the original Screw Agreement—was a placeholder that was intended by the parties to be updated with all relevant Medtronic parts that utilized Sasso's intellectual property. For whatever reason, this simply did not occur. Yet, despite no updates to Schedule B, Medtronic continued to pay Sasso for sixteen years under the agreement.

[59] We agree with Sasso that the parties' actions demonstrate modification of the contract by a course of conduct. The relevant inquiry before the jury was not whether a specific part was **included** in Schedule B, but which parts sold by Medtronic **utilized** Sasso's intellectual property and were therefore royalty bearing. Accordingly, because the Screw Agreement was modified by the conduct of the parties, the trial court properly rejected Medtronic's arguments that it had already paid Sasso all that he was due under the terms of the agreement.

### III. Exclusion of Evidence of Patent Invalidity

Medtronic next argues that the trial court abused its discretion by excluding evidence that, subsequent to Sasso's filing suit, the USPTO declared certain claims of the '313 Patent invalid.

#### A. Standard of Review

Decisions regarding the admissibility of evidence are entrusted to the sound discretion of the trial court. *State Farm Mut. Auto. Ins. Co. v. Earl*, 33 N.E.3d 337, 340 (Ind. 2015). On appeal, we review the trial court's evidentiary ruling for an abuse of that discretion. *Id.* "An abuse of discretion occurs if the trial court's decision is clearly erroneous and against the logic and effect of the facts and circumstances before the court or if its decision is without reason or is based upon impermissible considerations." *Arlton v. Schraut*, 936 N.E.2d 831, 836 (Ind. Ct. App. 2010), *trans. denied*.

#### B. The Trial Court Did Not Abuse its Discretion by Excluding Evidence of the Patent-claim Invalidity.

Medtronic argues that Sasso's claim for breach of contract on the Screw Agreement is dependent upon the validity of the '313 Patent. Thus, Medtronic asserts that evidence establishing that some of the patent's claims were later declared invalid was not only relevant, but potentially dispositive. Although Medtronic's arguments have some facial appeal, a closer examination of the facts reveals that the trial court's decision to exclude this evidence was not an abuse of its discretion.

The timeline below includes the relevant actions related to validity of the '313 Patent:

> May 1, 2018: Medtronic files a request with the USPTO to reexamine certain claims of the '313 Patent.

> June 29, 2018: the USPTO issues a nonfinal office action rejecting claims 26, 30, 31, and 34 of the '313 Patent.

> October 29, 2018: the USPTO issues a final office action rejecting claims 26 and 34.

> January 4, 2019: the USPTO issues a reexamination certificate cancelling claims 26 through 34 of the '313 Patent.

Medtronic maintains that it should have been permitted to present evidence to the jury regarding the USPTO's reexamination decision, noting that invalid patent claims are deemed cancelled *ab initio*. See *ePlus, Inc. v. Lawson Software, Inc.*, 789 F.3d 1349, 1358 (Fed. Cir. 2015). In Medtronic's view, the invalidity of the patent claims was relevant evidence that should have been admitted. We disagree.

A patent licensee must pay royalties until the date it first challenges validity. *Studiengesellschaft Kohle, M.B.H. v. Shell Oil Co.*, 112 F.3d 1561, 1566–68 (Fed. Cir. 1997). This is to "prevent the injustice of allowing [a licensee] to exploit the protection of the contract and patent rights and then later to abandon conveniently its obligations under those same rights." *Id.* at 1568. Here, Sasso claimed he was owed royalties through December 31, 2017—about six months

before Medtronic challenged validity. As noted in the timeline above, Medtronic did not challenge validity of the '313 Patent until May 1, 2018, and the USPTO did not officially cancel any of the patent's claims until **after** the jury trial in this case. While we acknowledge that Medtronic is technically an assignee, not a licensee, the same logic prevails. Indeed, it would be fundamentally unfair to permit Medtronic to exploit the protections of the '313 Patent vis-à-vis its competitors, then conveniently abandon its obligations under these rights vis-à-vis Sasso.

[66] In short, Medtronic, as an assignee, owed royalties on the '313 Patent until the date it first challenged validity, which was not until 2018—well after the date to which Sasso claimed royalties. Thus, evidence regarding validity was not relevant to the royalties sought by Sasso. Accordingly, the trial court did not abuse its discretion by excluding evidence that Medtronic, after taking advantage of the protections of the '313 Patent for years, subsequently and successfully challenged the validity of the operative claims of this patent.[16]

## IV. Duration of the Screw Agreement

[67] Medtronic next argues that the Screw Agreement terminated seven years from the date of first sale of any medical device covered by that agreement. As this

---

[16] We also disagree with Medtronic's argument that Sasso opened the door to issues of patent invalidity by conceding that the claims of the '313 Patent were broad. Sasso indeed acknowledged that the claims of the patent were broad, but the breadth of those claims benefitted Medtronic for years. And again, for purposes of Sasso's breach-of-contract claim, the patent was valid because Medtronic did not challenge the patent until 2018, and Sasso claimed damages only through the end of 2017. We further disagree with Medtronic that Sasso's counsel misled the jury by stating that the '313 Patent was in force. Counsel's statement was true with regard to Sasso's claim of royalties through 2017.

requires us to interpret the contract, our review is de novo. *Harrison v. Thomas,* 761 N.E.2d 816, 818 (Ind. 2002).

Section 4(B) of the Screw Agreement provided that Medtronic would pay to Sasso:

> A contingency payment in the amount of two and one-half percent (2-½%) of the worldwide Net Sales of the Medical Device. . . . The contingency payment is payable to Dr. Sasso until expiration of the last to expire of the patent(s) included in the Intellectual Property Rights, or seven (7) years from the Date of First Sale of the Medical Device, if no patent(s) issue. . . .

Ex. Vol. 14, p. 20. And Section 7, titled "Term of the Agreement," provided in relevant part:

> Unless sooner terminated, this Agreement shall expire upon the last to expire of the patents included in Intellectual Property Rights, **or if no patent application(s) issue into a patent having valid claim coverage of the Medical Device**, then seven (7) years from the Date of First Sale of the Medical Device. [Medtronic] is free to continue manufacturing, marketing and selling Medical Device(s) after expiration of this Agreement without further payment to Dr. Sasso.

*Id*. at 21 (emphasis added).

The language of these sections reveal that the parties intended for the contract to last for either (1) seven years from the date of the first sale of a covered medical device or (2) for the life of the patent. Medtronic claims Section 7 controls and that, under its language, life-of-patent royalties were dependent on the validity of

the patent claims. Because Medtronic eventually petitioned the USPTO to invalidate the operative claims of the '313 Patent, Medtronic asserts that it owed Sasso royalties for only seven years from the date of the first sale of a medical device incorporating his intellectual property. We disagree for several reasons.

[70] Even if we were to agree with Medtronic that Section 7 controls, we would disagree with Medtronic's interpretation of that section. Under Section 7, the Screw Agreement was to expire on "the last to expire of the patents included in Intellectual Property Rights, or **if no patent application(s) issue into a patent having valid claim coverage of the Medical Device**, then seven (7) years from the Date of First Sale of the Medical Device." Ex. Vol. 14, p. 21 (emphasis added). The first clause of this sentence—as does the similar language in Section 4(B)—states that the agreement will expire when the last patent included in the Intellectual Property expires. And because the '313 Patent did not expire until 2019, the agreement did not expire until that date.

[71] Yet, Medtronic insists that the second clause of Section 7 controls: the agreement lasts for only seven years from the date of first sale because "no patent application(s) issue into a patent having *valid* claim coverage of the Medical Device[.]" *Id*. Medtronic argues that, because of the USPTO reexamination, a patent did not issue having valid claim coverage of the medical device. Despite the USPTO's later action invalidating the operative claims of the '313 Patent, Medtronic ignores two key facts: (1) the '313 Patent did issue; and (2) the '313 Patent had valid claim coverage from 2001 to January 4, 2019, when the USPTO's issued the reexamination certification canceling certain claims. Again,

Medtronic would have us interpret the Screw Agreement in such a way as to permit them to benefit from the patent coverage for over a decade, then allow them to retroactively invalidate the patent claims to limit their obligation to pay to seven years. We disagree with Medtronic's interpretation of the contract in this manner.

[72] Moreover, if we were to agree with Medtronic's interpretation of the Screw Agreement, portions of Section 4(B) would be rendered meaningless. That section provided that Medtronic would pay royalties to Sasso for the life of the patent, without reference to the validity of any patent claims. To read Section 7 to make the payments contingent upon a valid patent would effectively re-write Section 4(B) to include a restriction that it simply does not contain. Such an interpretation would run counter to the well-settled principle that "[a]ll provisions of the contract should be construed in harmony with each other to promote consistency and avoid repugnancy among the various contract provisions." *Adkins v. Bluegrass Ests., Inc.*, 360 S.W.3d 404, 411 (Tenn. Ct. App. 2011).

[73] At most, the potentially conflicting language in Section 4(B) and Section 7 render the contract provisions regarding duration of the agreement ambiguous. Under Tennessee law, a provision of a contract is ambiguous when it has an uncertain meaning and may be reasonably understood in more than one way. *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002) (citing *Empress Health & Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190–191 (Tenn. 1973)). Ambiguous language in a contract must be construed against the drafter.

*Adkins*, 360 S.W.3d at 412 (citing *Jackson v. Miller*, 776 S.W.2d 115, 117 (Tenn. Ct. App. 1989)).

[74] Even if we found language in Section 4(B) and Section 7 ambiguous, we would construe the language against Medtronic. And Medtronic's actions demonstrate both that it believed that it owed Sasso royalties for the life of the patent and that the Screw Agreement expired when the '313 Patent expired. As Sasso points out, the royalty provision of the superseded original agreement between the parties tied royalties to the validity of the patent, but the royalty provision of the Screw Agreement did not. Moreover, Medtronic continued to pay Sasso royalties (albeit at a lower amount that he believed he was due) well past seven years from the date of first sale. For all of these reasons, the trial court did not err by concluding that Medtronic owed Sasso royalties for the life of the '313 Patent.

## V. Sufficient Evidence of Damages

[75] Medtronic also asserts that the damages the jury awarded on the Screw Agreement were not supported by the evidence. We employ an extremely deferential standard when reviewing a jury's damage award:

> A jury determination of damages is entitled to great deference when challenged on appeal. Because damages are particularly a jury determination, appellate courts will not substitute their idea of a proper damage award for that of the jury. Instead, the court will look only to the evidence and inferences therefrom that support the jury's verdict. We will not deem a verdict to be the result of improper considerations unless it cannot be explained on any other reasonable ground. Thus, if there is any evidence in the record that supports the amount of the award, even if it is variable

or conflicting, the award will not be disturbed. In addition, our inability to look into the minds of the jurors is, to a large extent, the reason behind the rule that we will not reverse if the award falls within the bounds of the evidence. We will vacate an award of damages only when it is not rationally related and so great as to clearly indicate that the jury was motivated by prejudice, passion, partiality, corruption, or that it considered an improper element.

*State Farm Fire & Cas. Co. v. Radcliff*, 987 N.E.2d 121, 151–52 (Ind. Ct. App. 2013), *trans. denied* (cleaned up). As our supreme court recently reiterated, we will not reverse if the damage award is within the scope of the evidence. *Int'l Bus. Machs. Corp. v. State*, 138 N.E.3d 255, 258 (Ind. 2019). "When reviewing the adequacy of a damages award in a breach of contract action, we do not reweigh evidence or judge witness credibility, and will consider only the evidence favorable to the award." *Farah, LLC v. Architura Corp.*, 952 N.E.2d 328, 337 (Ind. Ct. App. 2011). Still, the award cannot be based on speculation, conjecture, or surmise; it must be supported by probative evidence. *Id.*

[76] Medtronic raises two sufficiency arguments relating to damages awarded for breach of the Screw Agreement. Neither argument is persuasive.

[77] First, Medtronic contends that Sasso failed to prove that he was owed **any** life-of-patent royalties because they were due only if there was "valid claim coverage of the Medical Device," as set forth in Section 7. But the royalties were governed by Section 4(B), not Section 7. And, as noted above, Section 4(B) succinctly provided that Sasso would be paid 2.5% of the worldwide net sales of the Medical Device. There is no requirement that the Medical Device be covered by

a valid claim of an issued patent before royalties would be paid. We therefore reject Medtronic's claim that Sasso had to prove that his royalties were dependent upon whether the medical device(s) sold were covered by a valid patent claim.[17]

[78] Second, Medtronic claims that there was insufficient evidence to support the jury's award. Medtronic acknowledges that Sasso's expert witness, Mike Pellegrino, testified that Sasso's damages for breach of the Screw Agreement were $79,400,000; but Medtronic claims that this figure is "wildly inflated" and based on a flawed methodology.[18] Appellants' Br. p. 53. Medtronic thus claims that Pellegrino's testimony was insufficient to support the verdict. Under our highly deferential standard of review, this argument fails as the award is supported by probative evidence.

---

[17] Medtronic's claim that it had to sell all of the medical devices as a "kit" before it owed Sasso royalties is also unavailing. Medtronic argues that "[w]here a patent claim requires multiple components, a product is not covered by the claim unless it includes **all** the components." Appellant's Br. p. 50 (emphasis in original). Medtronic insists that it never made or sold the five instruments of claim 26 or the six instruments required by claim 34 of the '313 Patent together as a "kit." Medtronic tacitly admits that it sold the instruments but claims that it cannot be held responsible for how the surgeons used these instruments. In other words, Medtronic admits that it sold parts A, B, and C, but claims that it did not owe royalties to Sasso unless it sold parts A, B, and C together as single kit. The jury, however, heard evidence that Medtronic did sell such a "kit." Tr. Vol. 3, pp. 202–04. Regardless, Medtronic's entire argument is based on the false premise that the instruments at issue had to be covered by a valid claim before royalties were owed—Section 4(B) imposes no such requirement.

[18] Medtronic made no contemporaneous objection to Pellegrino's testimony. Accordingly, to the extent that Medtronic's argument is based on what it perceives to be problems with Pellegrino's methodology, this argument is waived. *See Radcliff*, 987 N.E.2d at 153 (noting that a party must object to evidence when it is offered into the record and that the failure to timely object waives the party's ability on appeal to argue that the admission of the evidence was erroneous). Although Medtronic notes that it unsuccessfully attempted to exclude Pellegrino's testimony at a *Daubert* hearing, this does not preserve any evidentiary error for purposes of appellate review. *See id.* (noting that pretrial motions do not preserve error and the party opposing the evidence must still object at trial).

The Screw Agreement defined Sasso's "Invention" to include any "product, method or system relating to a facet screw instrumentation." Ex. Vol. 14, p. 17. Thus, the royalties on the "Medical Device(s)" sold did not depend only on how Medtronic sold the instruments but also how they were used, i.e., the method or system used. And the royalty-bearing medical devices included screws and cages when implanted using Sasso's method or system—just as Medtronic indicated in 2002 shortly after the Screw Agreement was executed. Ex. Vol. 15, pp. 91–92.

Additionally, Robert Compton—Medtronic's former president and chief operations officer—testified that Sasso's work on the project and his assistance to Medtronic, i.e., "Intellectual Property Rights," was worth 2.5% of the net sales of the medical products even without patent protection. *See* Tr. Vol. 6 at 73–75; Ex. Vol. 14 at 18–20. Still, Pellegrino testified that the royalty-bearing products were implanted using a five-instrument kit as required by claim 26 of the '313 Patent. Tr. Vol. 11, pp. 132–33. And Sasso testified that Medtronic's own manuals for the products advertised his screw delivery system. *Id.* at 157.

In short, the jury heard evidence from several witnesses whose testimony established that Medtronic sold numerous instruments to be used in the minimally invasive spinal surgery technique invented by Sasso. And Sasso's expert testified, without objection, that 2.5% of the net sales of these products was worth almost $80,000,000. The jury accepted this testimony and awarded Sasso just over $79,000,000 in damages. Thus, the damage award was within the scope of the evidence. Medtronic's arguments to the contrary are little more than

a request that we reweigh the evidence and come to a contrary conclusion, which we may not do.

## VI. Sufficient Evidence of Vertex Damages

[82]     Lastly, Medtronic argues that there was insufficient evidence to support the jury's award of damages on the Vertex Agreement.[19] We reiterate that we will not reverse a jury's damages award if it is within the scope of the evidence, *Int'l Bus. Machs. Corp.*, 138 N.E.3d at 258, nor will we reweigh evidence or judge witness credibility, *Farah*, 952 N.E.2d at 337.

[83]     Medtronic contends that Sasso was improperly awarded royalties on four patents not listed in the Vertex Agreement. Under the terms of the Vertex Agreement, Sasso was entitled to life-of-patent royalties only if "the Medical Device is covered by a valid claim of an issued U.S. patent arising out of the Intellectual Property Rights[.]" Ex. Vol. 14, p. 7. The agreement defined "Intellectual Property Rights" as the patent application that issued as Patent '491 as well as any patents "issuing therefrom or claiming priority thereto," "any and all continuations, continuation-in-part, divisionals, reissues or reexaminations based thereon or claiming priority thereto," and "any and all know-how, technology and any other intellectual property right with respect to the Invention."[20] *Id.* at 5.

---

[19] Medtronic also argues that Sasso's claims for relief under the Vertex Agreement fall within the exclusive jurisdiction of the federal courts. For the same reasons as explained above, we conclude that the federal courts do not have exclusive jurisdiction over this contractual dispute.

[20] A listing of all Intellectual Property Rights was contained in Exhibit A which was to "be updated by [Medtronic] from time to time (at least yearly) as additional Intellectual Property Rights are added to the

[84] Based on this language, Medtronic argues that no reasonable jury could find that the Vertex Agreement extended beyond the life of any patent unrelated to the '491 Patent. Yet Sasso was awarded life-of-patent royalties on four additional patents for which he was not the named inventor (the '621, '277, '359, and '714 Patents). Medtronic therefore claims that Sasso could not assign any rights in these patents to Medtronic or demand royalties for Medtronic's use of patents he did not own. Medtronic asserts that these patents neither issued from the '491 Patent nor are they related to the '491 Patent. In our opinion, that claim fails.

[85] As Sasso notes, the Vertex Agreement does not require that he be the named inventor on any patent. Instead, the contractual language requires only that a patent issue arising out of Sasso's intellectual property rights. Ex. Vol. 14, p. 5. And the jury was presented with evidence that the '621, '277, 359, and '714 Patents arose out of Sasso's intellectual property. The Medtronic officer charged with negotiating the Vertex Agreement testified that Sasso provided the know-how embodied in the '621 Patent, much of which was copied verbatim from Sasso's '491 Patent. Tr. Vol. 2, p. 234. In fact, the jury was presented with Medtronic's written discovery responses admitting that the '621 Patent covered the Vertex system, Tr. Vol. 7, pp. 138–39, as well an internal memo stating that Sasso was a "designing" surgeon on Patent '277. Ex. Vol. 14, p. 243. Sasso also presented evidence that claims in both Patent 359 and 714 covered the Vertex

---

Agreement." Ex. Vol. 14, p. 5. Exhibit A lists U.S. Patent No. Application No. 09/6333,638, titled "Posterior Cervical Fixation System Utilizing Multi-Axial Screws," with a filing date of September 15, 2000. Ex. Vol. 14 at 12. This application issued as the '491 Patent. Tr. Vol. 3, p. 99.

system. A chart of his coverage opinions was admitted without objection. Tr. Vol. 4, p. 66; Ex. Vol. 18, p. 26. Sasso later testified consistent with these opinions. Tr. Vol. 5, pp. 39–42. We find that this was sufficient evidence from which the jury could reasonably conclude that the patents on Vertex improvements arose from Sasso's intellectual property rights as required by the Vertex Agreement.

[86]     Medtronic lastly argues that, despite Sasso's allegation to the contrary, none of the Vertex products it sold were covered by claims 21 and 48 of the '491 Patent. More specifically, Medtronic maintains that it did not make a product that included all three features of claim 21, and that none of its products met all specifications of claim 48. Thus, Medtronic argues that Vertex was not covered by the '491 Patent and it therefore did not owe any royalties to Sasso. We disagree, as there was substantial evidence that the products sold by Medtronic were covered by the '491 Patent. Medtronic paid royalties for seventeen quarters, implying that it too thought that the '491 Patent covered its products. Further, Sasso presented expert testimony that directly mapped products sold by Medtronic to claims 21 and 48 of the '491 Patent. Tr. Vol. 4, pp. 45–49.

[87]     In short, the jury's award of damages on the Vertex Agreement is supported by the evidence. Accepting Medtronic's contrary arguments would require us to reweigh the evidence and come to a contrary conclusion, which we may not do.

# VII. Sasso's Cross Appeal

[88] Finally, Sasso presents a cross-appeal in which he claims that the trial court erred by granting summary judgment in favor of Medtronic on Sasso's claim for punitive damages under the Vertex Agreement. Under Tennessee law, which controls the Vertex Agreement, punitive damages are generally not available in a breach-of-contract case. *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 211n.14 (Tenn. 2012). But punitive damages may be awarded in such a case "under certain circumstances." *Id.* Even then, an award of punitive damages is limited to "the most egregious cases" and is proper only where there is clear and convincing proof that the defendant has acted either "intentionally, fraudulently, maliciously, or recklessly." *Id.* (quoting *Goff v. Elmo Greer & Sons Constr. Co.*, 297 S.W.3d 175, 187 (Tenn. 2009)).

[89] Sasso, in arguing that he is entitled to punitive damages, refers to Medtronic's allegedly improper behavior in other agreements between the parties. But, as Medtronic correctly notes, the duty of good faith does not extend beyond the terms of the contract and cannot create additional contractual rights. *Regions Bank v. Thomas*, 422 S.W.3d 550, 560 (Tenn. Ct. App. 2013). We therefore agree with Medtronic that its behavior under these separate, unrelated contracts is irrelevant to the question of Medtronic's behavior under the Vertex Agreement.

[90] The other evidence Sasso relies on in support of his claim for punitive damages is the opinion of attorney Irving Rappaport. But the trial court struck Rappaport's declaration from the designated materials, concluding that it was conclusory—a decision that Sasso does not challenge on appeal. Sasso therefore cannot rely on

this evidence on appeal. *AKJ Indus. v. Mercantile Nat. Bank*, 779 N.E.2d 543, 545 (Ind. Ct. App. 2002), *trans. denied.* And we disagree with Sasso that the remaining evidence was sufficient to establish the requisite intent for punitive damages. The record shows that both of the parties are sophisticated and were represented by counsel. Given the complexity of the subject matter, it is not surprising that the parties did not agree on the issue of which products were royalty bearing. And the fact that there was evidence sufficient to support the jury's conclusion that Medtronic breached the contracts at issue is insufficient in itself as a matter of law to support an award for punitive damages. In short, because Sasso has failed to show that this is one of "the most egregious cases," the trial court did not err in granting summary judgment to Medtronic on Sasso's claim for punitive damages.

## Conclusion

[91] The trial court had subject matter jurisdiction over this case, and we reject Medtronic's argument that jurisdiction over this matter lies exclusively in the federal courts. We also hold that the trial court did not err by denying Medtronic's claim that it was entitled to judgment as a matter of law on the Screw Agreement inasmuch as the parties agreed to modify the terms of this agreement to forgo inclusion of royalty-bearing parts in Schedule B. Further, the trial court did not abuse its discretion by excluding evidence that, after this case was commenced, Medtronic successfully petitioned the USPTO to reexamine and invalidate certain claims of the '313 Patent. The trial court also properly rejected Medtronic's claim that the Screw Agreement terminated after seven

years, as opposed to being in effect for the life of the patents at issue. We also conclude that Sasso presented evidence sufficient to support the jury's award of damages under both the Screw Agreement and the Vertex Agreement. Lastly, we hold that the trial court did not err by granting summary judgment in favor of Medtronic on Sasso's claim for punitive damages, as Sasso failed to present any designated evidence to meet the elevated burden of proof for such claims under Tennessee Law.

[92] Affirmed.

Bradford, C.J., and Najam, J., concur.